2019 IL App (1st) 153232
No. 1-15-3232

FIRST DISTRICT
June 10, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Criminal Division. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 16584 |
| | ) | |
| WILSON MOROCHO, | ) | Honorable Matthew E. Coghlan, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE GRIFFIN delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1     After a bench trial, defendant Wilson Morocho was convicted of three counts of aggravated stalking. 720 ILCS 5/12-7.4(a)(1) (West 2014). The trial court merged the offenses and sentenced defendant to four years in prison. On appeal, defendant challenges the facial constitutionality of the offense upon which his conviction was predicated.

¶ 2     Defendant's conviction was predicated upon a violation of section 12-7.3(a)(2) of the Criminal Code of 2012 (Stalking Statute) (720 ILCS 5/12-7.3(a)(2) (West 2014)), which defines the offense of stalking as follows: a person commits stalking when he or she knowingly "threatens" a specific person two or more times and knows or should know the threats would

cause a reasonable person to suffer emotional distress. The offense is aggravated if the defendant causes bodily harm to the victim. 720 ILCS 5/12-7.4(a)(1) (West 2014).

¶ 3     Defendant argues that subsection (a)(2) is overbroad in violation of the first amendment (U.S. Const., amend. I) and criminalizes wholly innocent conduct in contravention of the guarantees of substantive due process. For the following reasons, we agree and find subsection (a)(2) facially overbroad and unconstitutional.

¶ 4                                    BACKGROUND

¶ 5     On August 25, 2014, Beatriz Avila was working the morning shift at a franchise in the James R. Thompson Center in Chicago. Throughout her shift she received a series of text messages from defendant, the father of her son. After she viewed a message and burst into tears, the victim's coworkers asked her what was wrong. What she told them prompted one of her coworkers to contact an Illinois State Police officer.

¶ 6     The victim was met by an officer and escorted to the second floor of the Thompson Center to file a police report. She alleged in the report that defendant sent her threatening text messages. After the report was filed, Illinois State Police officers told the victim to text defendant and ask him to come to her workplace. She sent the text and defendant showed up. He was immediately arrested.

¶ 7     Upon arrest, police recovered a knife wrapped in aluminum foil from defendant's person. They took pictures of the text messages defendant sent to the victim and photographed a bruise on her arm. Defendant waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and participated in a police interview.

¶ 8 Defendant confessed verbally and in writing to sending the threatening text messages to the victim on August 25, 2014, and possessing a knife on his person at the time of his arrest. He stated, however, that he did not intend to harm the victim.

¶ 9 Defendant was charged with three counts of aggravated stalking (720 ILCS 5/12-7.4(a)(1) (West 2014)) and 21 other offenses of which he was acquitted. We discuss here only the facts that relate to the relevant aggravated stalking (*id.*) offenses.

¶ 10 Defendant waived his right to a jury, and the parties tried the case before a judge. The State called the victim as its first witness. She testified that defendant sent her a series of threatening text messages in Spanish on August 25, 2014. The State introduced into evidence a series of photographs of the victim's cell phone screen that depicted text messages sent by defendant to the victim on the date in question.

¶ 11 One of the photographs showed defendant texted the victim, "[o]h, good, I have three knives. Let's see who I can kill in your house, hon." When the victim sent a message asking defendant where he was, defendant replied, "[a]t your job[.] But You are not coming out *** where are you?"

¶ 12 Another photograph showed that defendant sent a message telling the victim that her "mom arrived from work." When the victim messaged defendant and asked "[h]ow do you know that she arrived," he replied, "I know a lot of things. Will you go to my house today *** Or do you want problems with you father *** [s]o what, Hon, do you want problems or not."

¶ 13 The State also introduced into evidence a photograph defendant texted to the victim that depicted a knife wrapped in aluminum foil in his waistband. Defendant wrote below the photograph, "Yes, my love."

¶ 14    The victim further testified that defendant bruised her arm, on August 21, 2016, when he tried to pull her into a room in his house. She identified a photograph of her injury taken by an Illinois State Police officer.

¶ 15    Coworker Ruth Tenorio testified that she accompanied the victim to the second floor of the Thompson Center to file a police report after the victim received a text message from defendant that depicted him with a knife. She identified the photographs of defendant's text messages, the picture of him with a knife, and a photograph of the victim's bruised arm.

¶ 16    Illinois State Trooper Tracy Grantlen testified that she interviewed the victim on August 25, 2014, and prepared a police report regarding a stalking incident. She further testified that after defendant was arrested police recovered a knife from his person that looked similar to the one depicted in the text message defendant sent to the victim. Trooper Grantlen testified to first interviewing defendant with the assistance of Trooper Herrera, who spoke Spanish.

¶ 17    Trooper Herrera testified that defendant waived his *Miranda* rights and agreed to speak with him. Defendant admitted to sending the victim threatening text messages, including the message with the knife in his waistband. Defendant gave a written statement wherein he admitted to threatening the victim but stated that he "would never do anything bad." Trooper Herrera then contacted Assistant State's Attorney (ASA) Erick Sacks.

¶ 18    ASA Sacks testified that he interviewed defendant four times. Trooper Herrera was present to translate from Spanish to English, and defendant waived his *Miranda* rights before each interview. Defendant confirmed that he sent the text messages in question to the victim and acknowledged their content. ASA Sacks testified that, when asked, defendant denied he was going to follow through with his threats.

4

¶ 19    The State rested its case, and defendant moved for a directed finding. The trial court granted it in part and denied it in part. Defendant called a single witness and rested his case.

¶ 20    The trial court found defendant guilty of three counts (counts IXX, XX, and XXI) of aggravated stalking. 720 ILCS 5/12-7.4(a) (West 2014). Counts IXX and XX were predicated upon violations of subsection (a)(1) of the Stalking Statute (720 ILCS 5/12-7.3(a)(1) (West 2014)). Subsection (a)(1) defines the offense of stalking as follows: a person commits stalking when he or she knowingly "threatens" a specific person two or more times and knows or should know the threats would cause a reasonable person to *fear for his or her safety or the safety of a third person*. Count XXI, in contrast, was predicated upon a violation of subsection (a)(2) and charged defendant as follows:

> "[W]hile in conjunction with committing stalking by knowingly engaging in a course of conduct directed at [the victim] that he knew or should have known would cause a reasonable person to suffer emotional distress, to wit: threatening [the victim] and [her] family members via text message and going to her workplace, he also caused bodily harm to [the victim], to wit: bruising to [the victim's] body."

¶ 21    At sentencing, the trial court merged counts IXX and XX into count XXI. The trial court entered judgment on count XXI and sentenced defendant to four years in prison. Defendant appeals, and argues that subsection (a)(2) is facially unconstitutional. He does not challenge his convictions under counts IXX and XX or the constitutionality of subsection (a)(1).

¶ 22                                ANALYSIS

¶ 23    The issue on appeal is whether subsection (a)(2) is facially unconstitutional. We review this issue *de novo*. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009).

¶ 24　The offense upon which defendant's conviction was predicated, subsection (a)(2), defines stalking as follows: a person commits stalking when he or she knowingly "threatens" a specific person two or more times when he or she knows or should know that the threats would cause a reasonable person to suffer emotional distress. 720 ILCS 5/12-7.3(a)(2) (West 2014). Subsection (a)(2) was added to the Stalking Statute in 2010 as one of many amendments that greatly expanded the definition of the offense. See Pub. Act 96-686, § 5 (eff. Jan. 1, 2010) (amending 720 ILCS 5/12-7.3); 96th Ill. Gen. Assem., Senate Proceedings, May 21, 2009, at 125 (statements of Senator Hutchinson) ("This [bill] will broaden the definition of stalking.").

¶ 25　Prior to the 2010 amendments, the Stalking Statute defined stalking as requiring: (1) the transmission of a threat with the intent of placing a person in "reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint" and (2) two or more acts of following or surveillance undertaken in furtherance of the threat. 720 ILCS 5/12-7.3(a) (West 1992). This definition of the offense was challenged on first amendment grounds and survived on the basis that it prohibited speech integral to criminal conduct, which enjoys no first amendment protection. See *People v. Bailey*, 167 Ill. 2d 210, 227 (1995). It also survived the 2010 amendments and was renumbered as section 12-7.3(a-3) (Pub. Act 96-686 (eff. Jan. 1, 2010) (adding 720 ILCS 5/12-7.3(a-3)). We make clear that defendant in this case was not charged under subsection (a-3).

¶ 26　Unlike subsection (a-3), a portion of the new Stalking Statute did not survive a first amendment challenge. In *People v. Relerford*, 2017 IL 121094, ¶ 29, our supreme court addressed the constitutionality of the following offense of stalking as newly defined by the 2010 amendments: a person commits stalking when he or she knowingly "communicates to or about" a specific person two or more times and he or she knows or should know the communications

would cause a reasonable person to suffer emotional distress. The defendant argued that this portion of the statute criminalized a substantial amount of free speech and was overbroad in violation the first amendment. *Id.* ¶ 24.

¶ 27    Before reviewing the statute for overbreadth, the court considered whether the statute fell within the true threat and speech integral to criminal conduct exceptions to the first amendment, as historically defined, and concluded that it did not. *Id.* ¶ 48. The court reviewed the statute under the overbreadth doctrine, which holds that a statute is unconstitutional if a substantial number of its applications are unconstitutional when judged in relation to its plainly legitimate sweep (see *id.* ¶ 34), and found the statute reached "a vast array of circumstances that limit speech far beyond the generally understood meaning of stalking" and criminalized "a host of social interactions that a person would find distressing but are clearly understood to fall within the protections of the first amendment." *Id.* ¶¶ 52-54.

¶ 28    The statute was held facially overbroad and unconstitutional: "[W]e hold that the portion of subsection (a) of the stalking statute that makes it criminal to negligently 'communicate[ ] to or about' a person where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress, is facially unconstitutional." *Id.* ¶ 63. The phrase "communicates to or about" was stricken from the Stalking Statute, and the remaining provisions were left intact, including the "threatens" provision we address here. *Id.* ¶ 78.

¶ 29    The parties argue that *Relerford* commands a particular outcome in this case. Defendant claims "the State expressly predicated [defendant's] indictment and conviction on how his *communications* would negligently or knowingly cause [the victim] fear" and we are therefore obligated to vacate his conviction. The State argues that defendant was charged and convicted of

violating subsection (a)(2), which expressly "survived" constitutional scrutiny in *Relerford*. We address each argument in turn.

¶ 30    First, defendant's conviction was predicated upon *threatening* the victim under subsection (a)(2), not communicating to or about her. Second, subsection (a)(2) was not subject to scrutiny in *Relerford* where the court found the unconstitutional prohibition against "distressing communications to or about a person" stood "separate and apart" from the "proscription against threats." See 2017 IL 121094, ¶ 39. Accordingly, the parties' arguments are unavailing, and we reach the merits of defendant's constitutional challenge to subsection (a)(2).

¶ 31    At the outset, we reject the State's argument that defendant's conviction should be affirmed because, not only did he "threaten" the victim via text message, he went to her workplace. See 720 ILCS 5/12-7.3(c)(1), (c)(6) (West 2014) (prohibiting "non-consensual contact," which is defined to include "appearing at the workplace" of the victim). It is clear from the record that the Illinois State Police lured defendant to the Thompson Center in order to arrest him. The victim testified that she texted defendant and asked him to come to her work at the direction of police. There was nothing nonconsensual about defendant's appearance at the workplace of the victim on August 25, 2014. See *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 45 (holding that subsection (a) of the Stalking Statute criminalizes nonconsensual conduct, not innocent conduct).

¶ 32    That said, under subsection (a)(2), a person commits stalking when he or she knowingly threatens another two or more times and knows or should know that the threats would cause a reasonable person to suffer emotional distress. The offense is complete without any accompanying criminal act.

¶ 33    It is this court's duty to construe subsection (a)(2) so as to affirm its constitutionality if it is reasonably capable of such a construction. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 291 (2003). Subsection (a)(2) enjoys a presumption of constitutionality, and the burden is on defendant to clearly show that subsection (a)(2) is unconstitutional. *Id.*

¶ 34    The first amendment commands, " 'Congress shall make no law *** abridging the freedom of speech.' " *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002) (quoting U.S. Const., amend. I). That prohibition is imposed on the States through the due process clause of the fourteenth amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (Internal quotation marks omitted.) *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). This principle is, however, not absolute. *Id.* For instance, "true threats" receive no first amendment protection. See *Relerford*, 2017 IL 121094, ¶ 45.

¶ 35    A true threat is one where "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." See *Virginia v. Black*, 538 U.S. 343, 359 (2003); see also *Elonis v. United States*, 575 U.S. ___, ___, 135 S. Ct. 2001, 2012 (2015) (a true threat is one made "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat"). The parties' briefs focus primarily on the question of whether subsection (a)(2) falls within the true threat exception to the first amendment. Accordingly, we address and answer that question.

¶ 36    Subsection (a)(2) clearly lacks any requirement that a person threaten "an act of unlawful violence." See *Black*, 538 U.S. at 359. Under subsection (a)(2) as written, a person who "threatens" to commit a *lawful* act may be prosecuted. The provision further fails to limit the

9

threatened action to that of violence. 720 ILCS 5/12-7.3(a)(2) (West 2014). Under the plain language of subsection (a)(2), the threatened action must cause a reasonable person to "suffer *other* emotional distress" (emphasis added)—that is, emotional distress unrelated to a victim's "fear for his or her safety or the safety of a third person." *Id.* § 12-7.3(a).

¶ 37    In this way, subsection (a)(2) is unrecognizable as a valid proscription of "true threats" under *Black* and *Elonis*. The true threat definition has clear confines, and subsection (a)(2) does not fit within them. The State fails to advance any valid argument that another first amendment exception applies, and our analysis of subsection (a)(2) leads us to conclude that it does not prohibit only unprotected speech. Subsection (a)(2) does not criminalize speech integral to criminal conduct; subsection (a-3) serves that purpose. See *Bailey*, 167 Ill. 2d at 227. Accordingly, subsection (a)(2)'s restrictions do not fall within any of the "historic and traditional" categories of unprotected speech. See *Relerford*, 2017 IL 121094, ¶ 48 (citing *United States v. Stevens*, 559 U.S. 460, 471-72 (2010)).

¶ 38    We review subsection (a)(2) under the overbreadth doctrine, which provides that a law may be invalidated if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *People v. Clark*, 2014 IL 115776, ¶ 11. The United States Supreme Court provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech, especially when the statute imposes criminal sanctions. *Id.* The "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). We recognize that the invalidation of a statute under the overbreadth

doctrine is "strong medicine" and should be used only as a last resort. (Internal quotation marks omitted.) *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009).

¶ 39    The first step in overbreadth analysis is to construe the challenged statute because it is impossible to determine whether a statute reaches too far without first knowing what the statute covers. *United States v. Williams*, 553 U.S. 285, 293 (2008). Our analysis of whether subsection (a)(2) fell within an exception to the first amendment (U.S. Const., amend. I) also serves to define the statute's scope.

¶ 40    Under subsection (a)(2), a person commits stalking when he or she directly, indirectly, or through third parties, "threatens" a specific person with lawful or unlawful action, two or more times, and knows or should know the threats would cause a reasonable person to suffer emotional distress unrelated to a fear for one's safety or fear for the safety of a third person. Emotional distress is defined as "significant mental suffering, anxiety or alarm." 720 ILCS 5/12-7.3(c)(3) (West 2014).

¶ 41    Subsection (a)(2) reaches a vast number of circumstances that limit speech far beyond the generally understood meaning of stalking. See *Relerford*, 2017 IL 121094, ¶ 52. Our society is quick to condemn threats, and "true threats" are no doubt worthy of such condemnation, but under certain circumstances, threats are a perfectly ordinary means by which we induce others to undertake positive or corrective action. Threats can be proper motivating tools. Coaches may threaten their players with benching if they do not play defense, parents may threaten their children with no dessert if they misbehave. Under subsection (a)(2), such threats, if construed to cause significant distress, anxiety, or alarm, carry felony criminal liability. 720 ILCS 5/12-7.3(b), (c)(3) (West 2014).

¶ 42   Take, for example, a lender or his agent who repeatedly threatens an individual mortgagor who is behind on payments with foreclosure. This lender would be subject to felony prosecution (*id.* § 12-7.3(b)) if he or she should know the threats of foreclosure would cause a reasonable person in the mortgagor's circumstances to suffer emotional distress. To give an example of how subsection (a)(2) chills core political speech, consider an activist, similar to the one exemplified in *Relerford*, 2017 IL 121094, ¶ 53, who decides not to attend a town hall meeting because repeatedly threatening to bring a polluting business owner's operations to a halt with a boycott or injunction could result in arrest. If the activist should know his or her threats would cause a reasonable business owner to suffer emotional distress, the State may prosecute under subsection (a)(2).

¶ 43   Many times a person who twice threatens lawful action unrelated to violence and actually *intends* to trigger distress of another for the purpose of motivation is not a criminal stalker; he or she is an ordinary member of society engaged in any number of expressive actions attendant to everyday social, business, legal, and political interaction. Such motivational threats are constitutionally protected; "true threats" are not.

¶ 44   Subsection (a)(2) criminalizes ordinary action that is clearly understood to fall within the protections of the first amendment (U.S. Const., amend. I). Even core political speech is subject to criminal prosecution under subsection (a)(2), so long as the person who "threatens" lawful action should know his threats would cause a reasonable person to suffer emotional distress. This is untenable.

¶ 45   Embodied in the first amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v.*

*Sullivan*, 376 U.S. 254, 270 (1964). Pleasantries seldom induce positive action in a private setting or give rise to political action in a public one.

¶ 46    Indeed, as stated by the Supreme Court, *"[m]ost* of what we say to one another lacks religious, political, scientific, educational, journalistic, historical, or artistic value (let alone serious value), but it is still sheltered from government regulation." (Emphasis in original and internal quotation marks omitted.) *Stevens*, 559 U.S. 460 at 479. Given the "wide-ranging scope of the first amendment," we find that "its protection presumptively extends to many forms of speech that would fall within the broad spectrum of speech" restricted by subsection (a)(2). *Relerford*, 2017 IL 121094, ¶ 56.

¶ 47    The State argues that subsection (d)(2) of the Stalking Statute (720 ILCS 5/12-7.3(d)(2) (West 2014), which exempts "an exercise of the right to free speech or assembly that is otherwise lawful" from prosecution under subsection (a)(2), serves as a bar to unwarranted prosecutions. We disagree. Our supreme court construed subsection (d)(2) as "an affirmative defense that must be raised by a defendant at trial after a prosecution has been initiated" and, as such, did not "eliminate the chilling effect on protected speech or resulting self-censorship." *Relerford*, 2017 IL 121094, ¶ 61. The State's additional argument based on subsection (d)(2), that a case-by-case application of the "threatens" language would be constitutionally curative, is similarly unpersuasive. Subsection (d)(2) cannot solve the chilling effect subsection (a)(2) has on protected speech.

¶ 48    Our efforts to construe subsection (a)(2) in a manner that would uphold its constitutionality have given way, and we find its overbreadth both realistic and substantial. Accordingly, subsection (a)(2) is overbroad on its face and unconstitutional.

¶ 49   To be clear, we hold only the following offense unconstitutional: A person commits stalking when he or she "threatens" a specific person two or more times, and he or she knows or should know the threats would cause a reasonable person to suffer emotional distress. 720 ILCS 5/12-7.3(a)(2), (c)(1) (West 2014). Given our holding, we do not consider whether subsection (a)(2) fails to comport with the guarantees of substantive due process.

¶ 50   Defendant's aggravated stalking (*id.* § 12-7.4(a)(1)) conviction under count XXI must be reversed because it was predicated upon a facially unconstitutional criminal statute. See *People v. Mosley*, 2015 IL 115872, ¶ 55. Defendant's remaining convictions under counts IXX and XX, however, were predicated upon a violation of subsection (a)(1), which we did not consider here. Defendant has not raised any argument as to the validity or constitutionality of his convictions under counts IXX and XX. Accordingly, we remand this matter to the trial court to enter judgment and impose a sentence. *Relerford*, 2017 IL 121094, ¶¶ 74-75; *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 115 (we lack the power to review convictions the defendant has not in fact appealed).

¶ 51   As a final matter, the parties agree that the trial court erred when it imposed upon defendant a $5 electronic citation fee pursuant to section 27.3e of the Clerks of Courts Act (705 ILCS 105/27.3e (West 2014)) and a $5 court system fee under section 5-1101(a) of the Counties Code (55 ILCS 5/5-1101(a) (West 2014)). They further agree that the imposition of a $15 police operations fee should be offset by the credit for defendant's presentence custody because it is a "fine." See *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31.

¶ 52   On February 26, 2019, while this appeal was pending, our Supreme Court adopted new Illinois Supreme Court Rule 472, which sets forth the procedure in criminal cases for correcting sentencing errors, in as relevant here, the "imposition or calculation of fines, fees and

assessments or costs" and the "application of *per diem* credit against fines." Ill. S. Ct. R. 472(a)(1), (2) (eff. March 1, 2019). Subsequently, on May 17, 2019, Rule 472 was amended to provide that "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). "No appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule unless that alleged error "has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. May 17, 2019). Therefore, pursuant to Rule 472, we "remand to the circuit court to allow [defendant] to file a motion pursuant to this rule," raising the alleged errors regarding the $5 electronic citation fee, $5 court system fee and $15 police operations fee. Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 53                                    CONCLUSION

¶ 54     Based on the foregoing, we find subsection (a)(2) is facially unconstitutional. We reverse defendant's conviction and sentence on count XXI and remand this case to the trial court with directions to consider counts IXX and XX, and enter judgment and impose sentence, and to allow defendant to file a motion pursuant to Illinois Supreme Court Rule 472 (eff. May 17, 2019).

¶ 55     Reversed in part; remanded with directions.