2015 IL App (4th) 130799

NO. 4-13-0799

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| STANLEY A. DYE, | ) | No. 13CF90 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Craig H. DeArmond, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1    In a bench trial, the trial court found defendant, Stanley A. Dye, guilty of threatening a public official (720 ILCS 5/12-9 (West 2012)).  The court sentenced him to imprisonment for three years.  He appeals, challenging the sufficiency of the evidence.  We reverse the trial court's judgment because when we look at the evidence in the light most favorable to the prosecution, we conclude it would be impossible for any rational trier of fact to find, beyond a reasonable doubt, that defendant made a "true threat" within the meaning of *Virginia v. Black*, 538 U.S. 343, 359-60 (2003).  His threat, " 'I'm gonna get you,' " was ambiguous as to whether the intended meaning was violent retribution or nonviolent retribution, and nothing about the context of the threat could reasonably resolve the ambiguity.

I. BACKGROUND

¶ 3        On February 7, 2013, defendant had an appointment with his attorney, Jacqueline Lacy, the Vermilion County public defender.  The appointment was in her office, on the third floor of the courthouse.  In their meeting, Lacy told him she had some bad news:  because he had been less than forthright with her, she had subpoenaed some documents, and as a result, she had inadvertently uncovered evidence that was harmful to his case.  The State would receive a copy of the subpoenaed documents.  Evidently, the documents pertained to the chemical testing of a crack pipe.

¶ 4        Defendant became irate and demanded that Lacy have the crack pipe retested. She declined to do so.  He raised his voice.  She raised her voice.  He threatened to complain about her to Judge DeArmond and request a different attorney.  She said to go ahead, but she predicted that Judge DeArmond would decline to appoint him a different attorney.  He accused her of selling him out and working for the State.  She told him he "needed to" leave her office. He did so.

¶ 5        As he was exiting through the waiting room, defendant told Lacy, two or three times, " 'I'm gonna get you.' "  He pointed at her or at the floor as he said those words.  Lacy asked him, " 'Are you fucking threatening me?' "  According to defendant's testimony, he replied, " 'No, no.  I ain't threatening you.' "  A paralegal who worked in the public defender's office, Andrew Bower, had stepped between defendant and Lacy because of "the way [defendant] was standing, his mannerisms, how aggressive he was with his speech, his posture."  Bower put his hand on defendant's shoulder, to guide him out the door and into the hall.  Defendant ignored him and left.

¶ 6        Lacy, who was scared, trembling, and on the verge of tears, called the police.

¶ 7                                                    II. ANALYSIS

¶ 8             Various statutes, including section 12-9 of the Criminal Code of 2012 (720 ILCS

5/12-9 (West 2012)), criminalize the making of threats.  From the Supreme Court's decision in

*Watts v. United States*, 394 U.S. 705, 708 (1969), the appellate court has derived the rule that if

the State charges the defendant with making a threat of violence, the threat must be a "true

threat," or else the prosecution would violate the first amendment (U.S. Const., amend. I), made

applicable to the states by the fourteenth amendment (U.S. Const., amend. XIV; *Black*, 538 U.S.

at 358).  *People v. Sucic*, 401 Ill. App. 3d 492, 502-03 (2010) (citing *Watts*, 394 U.S. at 708);

*People v. Diomedes*, 2014 IL App (2d) 121080, ¶ 30 (citing *Sucic*, 401 Ill. App. 3d at 502-03).

¶ 9             In *Black*, the Supreme Court described a "true threat" as follows:

                " 'True threats' encompass those statements where the

                speaker *means* to communicate a serious expression of an intent to

                commit an act of unlawful violence to a particular individual or

                group of individuals.  [Citations.]  The speaker need not actually

                intend to carry out the threat.  Rather, a prohibition on true threats

                protect[s] individuals from the fear of violence and from the

                disruption that fear engenders, in addition to protecting people

                from the possibility that the threatened violence will occur.

                [Citation.]  Intimidation in the constitutionally proscribable sense

                of the word is a type of true threat, where a speaker directs a threat

                to a person or group of persons with the *intent* of placing the

                victim in fear of bodily harm or death."  (Emphases added and

                internal quotation marks omitted.)  *Black*, 538 U.S. at 359-60.

¶ 10    Thus, a "true threat" requires intentionality (*id.*), in contrast to section 12-9(a)(1) (720 ILCS 5/12-9(a)(1) (West 2012)), which, by its terms, requires merely knowledge ("knowingly"). Because we must interpret section 12-9 (720 ILCS 5/12-9 (West 2012)) "within the confines of the first amendment" (*Diomedes*, 2014 IL App (2d) 121080, ¶ 30); and because the first amendment allows a state to punish an alleged threat of violence only if it is a "true threat" (*id.*; *Sucic*, 401 Ill. App. 3d at 502-03); and because a "true threat" is intentional, not merely knowing (*Black*, 538 U.S. at 359-60), we interpret section 12-9 as requiring intentionality. See also *Elonis v. United States*, ___ U.S. ___, ___, 135 S. Ct. 2001, 2012 (2015) (the government had to prove conscious wrongdoing, not merely that a reasonable person would regard the communications as threats). (In his brief, defendant does not appear to attack the constitutionality of section 12-9. He does not contend that because section 12-9, by its terms, requires only knowledge instead of intent, the statute violates the first amendment. Instead, he takes the position that, when assessing the sufficiency of the evidence, we should substitute intent for knowledge as the required mental state. He argues, for example: "There is no evidence that [defendant] intended for his statement to threaten Lacy.")

¶ 11    Obviously, no witness had direct sensory access to defendant's mind and intent. Therefore, the trier of fact could determine what he intended only by drawing inferences from his conduct, including what he said. See *People v. Ybarra*, 156 Ill. App. 3d 996, 1002 (1987). Looking at the evidence in the light most favorable to the prosecution, would it be possible for any rational trier of fact to find, beyond a reasonable doubt, that defendant intended to physically threaten Lacy? See *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). He told her repeatedly, " 'I'm gonna get you.' " He did not thereby say he necessarily was going to harm her physically. To "get" someone means to "[p]unish, injure, or kill" someone, "especially as retribution." The

New Oxford American Dictionary 712 (2001). "Getting" someone *can* mean injuring or killing that person, but alternatively it can mean punishing that person in a nonviolent way. The New Oxford American Dictionary gives this example: " '[W]ait until Dad comes home, then you'll get it!' " (Emphasis omitted.) *Id.* "Get," in this context, probably does not mean injury or death. Likewise, the victim of a prank or of Machiavellian office politics might tell the perpetrator, "I'll get you for this," without intending to be understood that the retribution will be physical. The Internal Revenue Service will get you if you lie in your income tax return.

¶ 12        "Get" is just as apt a word for nonviolent punishment as violent punishment, and some additional facts, beyond the mere utterance, would be necessary to infer, beyond a reasonable doubt, that "I'm going to get you" was intended as a threat of violence. Did defendant intend to be understood as making a physical threat? See *Black*, 538 U.S. at 360 ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."). Answering that question would be like flipping a coin. We should draw only *reasonable* inferences in favor of the prosecution; we should not make random speculations in favor of the prosecution. *Cunningham*, 212 Ill. 2d at 280. When reviewing the record, we see no evidence justifying a reasonable inference that when defendant told Lacy, " 'I'm gonna get you,' " he intended to convey the idea of violent retribution as opposed to nonviolent retribution. Granted, defendant was shouting, as was Lacy, and Bower described defendant's "speech" and "posture" as "aggressive." When people are angry, however, they tend to become loud and tense and to make vigorous gestures—even when threatening to do something nonviolent. Defendant had just got done warning Lacy he was going to complain about her to Judge DeArmond. That cannot be a pleasant prospect for a public defender. Another way to "get back" at a reputedly

disloyal attorney would have been to report the attorney to the Attorney Registration and Disciplinary Commission. On the record before us, we do not see how it would be possible for any rational trier of fact to infer, beyond a reasonable doubt, that when defendant told Lacy, " 'I'm gonna get you,' " he meant violent retribution as opposed to these forms of nonviolent retribution—one of which he had just got done discussing with her. In the absence of any evidence that could justify a finding, beyond a reasonable doubt, that defendant's threat was a "true threat," we reverse his conviction on the ground that it violates the first amendment, made applicable to the states by the fourteenth amendment. See *Black*, 538 U.S. at 359 (" 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.").

¶ 13                                  III. CONCLUSION

¶ 14          For the foregoing reasons, we reverse the trial court's judgment.

¶ 15          Reversed.