# Illinois Official Reports

## Appellate Court

**People v. Wood, 2017 IL App (1st) 143135**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEXANDER WOOD, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-3135 |
| Filed<br>Rehearing denied | November 20, 2017<br>January 9, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-7597; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Daniel T. Mallon, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and David Welch, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Justices Harris and Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1    In a fit of exasperation with his legal and financial troubles, defendant Alexander Wood called the public defender's office and left a crude and offensive rant about how much he hated everyone involved in his legal case. He stated that he dreamed every day about revenge, and he singled out the judge presiding over his case, stating that he hoped for the judge's death and destruction. Defendant was charged and convicted of threatening a public official. We hold that defendant did not make a true threat as a matter of law and that the State failed to prove defendant knowingly transmitted any communication to the judge.

¶ 2                                        BACKGROUND

¶ 3    In 2012, defendant was on probation, and the judge presiding over his case was Judge Anthony Calabrese. Defendant was represented by a public defender for at least one court appearance while on probation, but he had a private attorney for other appearances. At a court appearance in October 2012, defendant moved the court to terminate his probation or alternatively to transfer his probation to Virginia. Defendant informed the court that he wanted to marry a woman who was in the Navy and was stationed there. Following a hearing, Judge Calabrese denied the motion.

¶ 4    Defendant was fired from multiple jobs and had difficulty meeting his probationary financial requirements, and he blamed the terms of his probation for his hardship. Even though his probation was set to be terminated in April 2013, defendant figured he would not be released from his probation because he could not afford the fees. Frustrated one night in March 2013, defendant looked up the public defender's phone number and left a voicemail.

> "There is not a day that goes by since I was sentenced at that courthouse that I have not dreamed about revenge and the utter hate I feel for the judge, and the utter hate I feel for the prosecuting attorney, and the utter hate I feel for the corporation that bound me in chains. There's not a day that goes by that I don't pray for the death and destruction upon the judge and upon every single person who sentenced me, and in front of witnesses, in front of everyone, and my utter hatred of you and of every other attorney there. You make me sick to my motherfucking stomach. And I hate you. And I hate the prosecuting attorney. And I hate Judge Calabrese. And I hate you all so very, very much. For the evil you did is un-freaking speakable and the lack of remorse I feel is because of the injustice done to me. You all can suck it because I hate you all with the bottomless, deepest hate of my heart."

¶ 5    Five days later, Assistant Public Defender Barry Horewitch went to Judge Calabrese's courtroom, and while the judge was on the bench, told the judge that he needed to speak to him about something important. Horewitch told Judge Calabrese about the voicemail and then played the voicemail for the judge in the presence of an assistant state's attorney. At that time, no one knew the identity of the person that left the voicemail.

¶ 6    The judge alerted the sheriff in charge of security and his supervising judge. A police officer was assigned to investigate. Judge Calabrese testified at trial that he took the voicemail as a threat. He changed his routine, would not stay at the courthouse after hours, and was otherwise vigilant. He was scared for his own safety and that of his family. About three weeks

after the call was made and two weeks after the judge heard the message, defendant was identified as the caller.

¶ 7    Defendant was arrested and charged with threatening a public official. He admitted making the call, but claimed it was not a threat. He claimed he was overwhelmed by his legal troubles and wanted to tell the public defender exactly how he felt. He claimed that he never intended the message for the judge nor did he think the judge would ever hear it.

¶ 8    Prior to this incident, in September 2011, defendant was fired from his position at a marketing agency on the recommendation of one of his coworkers. That coworker testified in this case that after defendant was fired, defendant called him on the phone and threatened to kill him and his family. Defendant pled guilty to telephone harassment in that case and was sentenced to two years probation. That term of probation is the one that was ongoing when defendant made the call to the public defender's office that is the subject of this case.

¶ 9    Following a jury trial, the jury found defendant guilty of threatening a public official. The trial judge sentenced defendant to two years in prison. Defendant appeals.

¶ 10                                   ANALYSIS

¶ 11   To sustain a conviction for threatening a public official, the State must prove three elements beyond a reasonable doubt: (1) that defendant knowingly and willfully communicated, directly or indirectly, a threat to a public official; (2) that the threat would place the public official in reasonable apprehension of immediate or future bodily harm; and (3) that the threat was related to the official's public status. *People v. Kirkpatrick*, 365 Ill. App. 3d 927, 930 (2006); 720 ILCS 5/12-9(a)(1)(i) (West 2012).

¶ 12   Defendant does not challenge the fact that Judge Calabrese is a public official or that the communication was conveyed in relation to Judge Calabrese's status as a public official. However, defendant argues that his conviction should be reversed because he did not convey any communication to Judge Calabrese at all, either directly or indirectly, and because the content of the communication was not a true threat.

¶ 13   We begin by analyzing whether defendant even made a threat to Judge Calabrese. A "threat" is "[a] communicated intent to inflict harm or loss on another or on another's property." Black's Law Dictionary 1618 (9th ed. 2009). In interpreting the statute for the offense of threatening a public official, we have held that intentionality on the defendant's part is required. *People v. Dye*, 2015 IL App (4th) 130799, ¶ 10. Intentionality in this context means that, for a conviction for threatening a public official to stand, the threat must be a " 'true threat.' " *Id.* A true threat is a communication in which " 'the *speaker means* to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' " (Emphasis added and in original.) *Id.* ¶ 9 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Under recent United States Supreme Court precedent, statutes criminalizing speech for being threatening require proof that the speaker intends the communication to be a threat and that a reasonable listener would understand the communication to be threatening. *Elonis v. United States*, 575 U.S. ___, ___, 135 S. Ct. 2001, 2011 (2015).

¶ 14   Again, the part of the defendant's communication that the State principally relies upon to argue in favor of upholding the conviction is defendant's statement that "there is not a day that goes by since I was sentenced at that courthouse that I have not dreamed about revenge and the

utter hate I feel for the judge" and "there's not a day that goes by that I don't pray for the death and destruction upon the judge." Neither of those statements individually nor the communication in its entirety threatens "immediate or future bodily harm, sexual assault, confinement, or restraint." See 720 ILCS 5/12-9(a)(1)(i) (West 2012). Neither of the statements nor the communication in its entirety contains a "serious expression of an intent to commit an act of unlawful violence to a particular individual." *Black*, 538 U.S. at 359.

¶ 15    A person expressing a dream for revenge is not the same as an expression that the person intends to undertake physical retaliation or commit violence. As in *Dye*, where the defendant repeatedly stated to a public defender "I'm gonna get you" (*Dye*, 2015 IL App (4th) 130799, ¶ 11), dreaming about revenge in no way proves that defendant was communicating an intent to seek violent retribution. Defendant made no actual threat of undertaking any act related to his dream for revenge. In the same way, praying for the death and destruction of the judge does not amount to a threat that defendant is going to do anything so that his prayers are realized. The statements are not "serious expression[s] of an intent to commit an act of unlawful violence to a particular individual," as the Supreme Court requires for criminalizing such speech. See *Black*, 538 U.S. at 359. Defendant never said he was going to do *anything*—just that he hoped and prayed bad things would befall those that he felt had wronged him.

¶ 16    The State argues that the circumstances surrounding the phone call show that defendant intended to make a threat and that a reasonable person could construe the communication as a threat. The circumstances surrounding the threat are obviously important. *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*). The State points out that defendant was admittedly upset with Judge Calabrese's ruling and that he called after-hours, from a blocked number, and did not leave his name. The State emphasizes that defendant mentioned Judge Calabrese by name in the message. Judge Calabrese also testified cogently about his subjective apprehension after the message was played for him by the assistant public defender. He became suspicious of others and was scared for the safety of himself and his family. Defendant also had a previous conviction for threatening a former coworker on the phone.

¶ 17    While unsettling, the context elucidated by the State does not transform the remarks into a true threat. When reviewing the record, there is no evidence justifying a reasonable inference that defendant intended to convey the idea of violent retribution. See *Dye*, 2015 IL App (4th) 130799, ¶ 12. Hypothetical and aspirational statements are not true threats as a matter of law. See, *e.g.*, *United States v. O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011). Even back to the basic dictionary definition, defendant did not communicate an "intent to inflict harm." He did not communicate an intent to do anything.

¶ 18    The case the State relies upon that best supports its position is *People v. Peterson*, 306 Ill. App. 3d 1091 (1999). In *Peterson*, the defendants sent three letters, alternatively signed by " 'Almighty God' " or by themselves as " 'Servants of Almighty God.' " *Id.* at 1095. The letters contained statements such as " 'I can kill all your servants if you like now, or we can end this now by paying [defendants] for their losses and then some, or else you will lose your life, for your time is short also.' " *Id.* Another letter demanded $8 million and indicated that "If this is not done and you don't want to participate, my Father, God Almighty, shall take your life now, today. *** This is your last chance—do or die—for your father has already made arrangements with my Father, for if you double cross us at any time, your life will be taken." *Id.* at 1095-96. The letters were sent to litigation adversaries and to three judges. *Id.* at

1095-97. There were more than a dozen death threats issued, but most of them were attributed to God rather than defendants.

¶ 19 On appeal, the defendants argued that they did not make true threats because they only stated that God would kill the recipients if they did not do what the defendants demanded, not that the defendants themselves would do anything. *Id.* at 1099. We rejected that argument and found the threats to be unmistakably hostile and that the acts defendants wanted the recipients to perform were clearly specified, as were the consequences of noncompliance. *Id.* at 1101.

¶ 20 Aside from the fact that the Petersons were convicted for a different crime—the offense of intimidation (720 ILCS 5/12-6 (West 2012))—this case is readily distinguishable. Defendant here never said that anybody or anything was going to kill the judge. Defendant also made no demands and did not threaten harm for a failure to meet those demands. Defendant did not threaten anything. In *Peterson*, not only did the letters sometimes expressly say that the Petersons would take action, even their threats about what God would do were transparent attempts to communicate the consequences for noncompliance that would befall the recipients if the Petersons did not get what they wanted.

¶ 21 A couple examples, though obviously not binding in any way, show why the communication made by defendant cannot be considered a crime. Insults accompanied by statements such as "I hope you die," without more, are not threats at all, let alone true threats. *People v. Winsbarrow*, No. 2015NY021032, 2015 WL 5448240, at *3 (N.Y. Crim. Ct. Sept. 17, 2015). Such statements do not warn the recipient of any sort of future harm, and they lack the requisite specificity to make them susceptible to criminalization. *Id.* Where a disgruntled inmate wrote a letter to prison officials expressing that he " 'hope[s] you bastards die a violent death.' " The court explained that the phrase "taken in context, however, does not constitute a conditional or actual threat, but expresses a desired outcome without insinuating or otherwise suggesting that the speaker will engage in a course of conduct likely to increase the probability of the desired outcome." *Griffin v. Lockett*, Civil No. 1:CV-06-02445, 2009 WL 179685, at *5 (M.D. Pa. Jan. 26, 2009). Or when a student posted a list of names on a website under the heading " 'people I wish would die,' " the court held that disciplinary action against the student constituted a first amendment violation because there was no actual threat made against any of the people named on the website. *Mahaffey ex rel. Mahaffey v. Aldrich*, 236 F. Supp. 2d 779, 786 (E.D. Mich. 2002); see also *Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001) (illustrations and writings depicting fantasies of revenge and destruction are not true threats).

¶ 22 The same result must apply here. While distasteful, inept, and crude, defendant's statement is not criminal. It is a vague, hyperbolic statement expressing defendant's feelings, not making a true threat. The State cannot criminalize a defendant's hope that a judge dies, even if the defendant articulates those hopes. The State cannot criminalize a defendant's dream for revenge unless, along with that expressed dream, the defendant seriously expresses an intention to commit an act of unlawful violence to fulfill his dream. There was no such expression in this case. The referenced statements do not warn of any future harm. They are vague and ambiguous; they do not indicate defendant has the means to carry out a threat; they do not indicate any actual intent to carry out a threat or any intent to affirmatively do anything. The lack of specificity and the lack of an expression that defendant had *any intention* to do *anything* makes it impossible to find defendant's rant to be "a serious expression of an intent to commit a violent act."

¶ 23    In addition to there not being a threat that would permit the criminalization of the speech, the State did not introduce any evidence that defendant knew that the purportedly threatening statements he made about the judge would be conveyed to judge. The statute for threatening a public official requires proof that defendant knowingly and willfully communicated, directly or indirectly, a threat to a public official. 720 ILCS 5/12-9(a)(1) (West 2012).

¶ 24    *People v. Garcia*, 2015 IL App (2d) 131234, supports the State's position. In *Garcia*, defendant directed profanities at the sitting judge, and the judge held defendant in contempt of court. *Id.* ¶ 2. While defendant was being remanded to custody to be transported to jail, he made several threats of violence against the police and threatened to kill the judge. *Id.* ¶ 3. Defendant was found guilty of threatening a public official. On appeal, defendant argued that he could not be convicted of threatening a public official because he only made the comment *about* the judge, not *to* the judge. *Id.* ¶ 9. Noting that the statute permitted a conviction when the threat was made indirectly to the official, we held that "[b]y making threatening statements in the presence of personnel of law-enforcement agencies, who reported the threats to a police officer, who informed the public official about whom the threats were made, defendant indirectly conveyed the threats to the public official." *Id.*

¶ 25    The court further explained that the failure to "specifically request that a threat be passed along to the target does not preclude the possibility of circumstances existing that would nearly guarantee that the threat would be conveyed to the target." *Id.* ¶ 10. The court continued, "[h]ere, the jury could reasonably infer that it was a practical certainty that threats against a judge, made in the presence of personnel of law-enforcement agencies, would be brought to the judge's attention." *Id.*

¶ 26    However, this case is different in important ways. Defendant made a phone call to the public defender's office and left a message on the public defender's office's voicemail. The public defender is not law enforcement like the officers to whom the threats were made in *Garcia*. In addition, the phone number for the judge's chambers is listed publicly. Instead of calling the judge to make a "threat" against the judge, defendant Googled the public defender's office and called there instead. If defendant wanted to knowingly convey a threat to the judge, he had the opportunity. Defendant specifically testified that he intended to convey his message and his dissatisfaction to the public defender, not Judge Calabrese. In the message, defendant repeatedly refers to the public defender as "you" indicating that he knew who he was addressing and who the intended recipient of his message was.

¶ 27    The State offered no evidence that defendant intended for the judge to hear this communication. On the flip side, defendant testified that he did not intend for the judge to hear the communication and specifically chose the public defender because he thought he could air his grievances confidentially. Defendant testified that he wanted to tell the public defender exactly how he felt. There was nothing in the message suggesting that defendant wanted it to be delivered or conveyed to anyone else.

¶ 28    The State offered no evidence that defendant knew his statement would be communicated to the public official in question—Judge Calabrese. However, the State argues that, like in *Garcia*, there was a practical certainty that the public defender's office would relay the message to Judge Calabrese. There is a difference between the public defender feeling obligated to alert the judge about the message and defendant *knowingly* transmitting a threat *to* the judge. The evidence at trial proved the former, but not the latter.

¶ 29                                                CONCLUSION

¶ 30          Accordingly, we reverse.

¶ 31          Reversed.