# Illinois Official Reports

## Appellate Court

---

### *People v. Khan*, 2018 IL App (2d) 160724

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ADEN D. KHAN, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0724 |
| Filed | October 11, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 13-CF-629; the Hon. George J. Bakalis, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Edward R. Psenicka, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, defendant, Aden D. Khan, was convicted of committing disorderly conduct by making a threat of violence against persons at a school (720 ILCS 5/26-1(a)(3.5) (West 2012)) and sentenced to 30 months' probation. On appeal, he contends that (1) the disorderly conduct statute is unconstitutional and (2) he was not proved guilty beyond a reasonable doubt. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    As pertinent here, a person commits disorderly conduct when he or she "knowingly *** [t]ransmits or causes to be transmitted a threat of destruction of a school building or school property, or a threat of violence, death, or bodily harm directed against persons at a school, school function, or school event, whether or not school is in session." *Id.* The indictment against defendant charged that on March 5, 2013, he "knowingly transmitted a threat of violence directed against persons at a school, being North Central College, in that on www.facebook.com/NCCConfessions.1, defendant posted, 'I bring a gun to school every day. Someday someone is going to p*** me off and end up in a bag.' "

¶ 4    Defendant moved to dismiss the indictment, contending that the statute unconstitutionally criminalizes innocent conduct by requiring only that the defendant knew that a statement could be construed as a threat but not that he intended that the recipient feel threatened. He contended that in *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001 (2015), the United States Supreme Court read a heightened *scienter* requirement into a federal statute that criminalizes transmitting a threatening statement that a person knows or should know would intimidate a reasonable recipient. He argued, however, that our supreme court has refused to read any mental state into statutes that criminalize innocent conduct but has instead invalidated these laws as lacking a rational basis. The motion cited, among other opinions, *People v. Carpenter*, 228 Ill. 2d 250 (2008), and *People v. Wright*, 194 Ill. 2d 1 (2000). The trial court denied the motion.

¶ 5    At trial, the State first called Melissa Hinkle. The court instructed the jury that her testimony was to be considered solely on the issue of defendant's intent. Hinkle testified as follows. On November 9, 2010, while working as a police officer in Novato, California, she went to defendant's high school and learned that, on October 19, 2010, he had posted a message on Facebook, titled "The people who i want to kill most." The list included "1. my stepmother who has f*** up my life[,] 2. my father for the same reason[,] 3. my brother for tormenting me since birth[,] 4. f*** brandon for talking hella s*** and for being a f***[,] 5. ruben bautista for talking too much s*** and cuz i already promised to kill him[,] 6. whatever a*** told casper that i was planning to shoot up the school[,] 7. whatever a*** told casper that i carried a knife[,] 8. the pope, just for laughs[,] 9. ms. limacher: worst teacher evergave me a referral for spitting on the sidewalk[, and] 10. god, if he/she/it exists." At the time, defendant was 17 years old.

¶ 6    Hinkle testified that she spoke to defendant at his home. He said that he had explained to "Mr. Casper" that he wrote the message because he was "venting." Defendant was not charged with a crime but was suspended from school for five days.

¶ 7        Kimberly Sluis testified as follows. In March 2013, she was the dean of students at North Central College in Naperville. In February, she first visited the "North Central Confessions" Facebook page. The page displayed the college's logo but had been set up without its permission. On March 5, 2013, Sluis read the post at issue and saw it as "directly threatening to our campus community." To Sluis, the post meant that "there was somebody coming to our campus daily with a gun, and that if the right set of circumstances existed the person would use that weapon against members of our campus community." Sluis called "campus safety," which in turn notified the Naperville police. At that point, she did not know who had posted the message. On March 5, 2013, nobody named Aden Khan was or had been enrolled at North Central College. Cassandra Balaskas was attending the school and had been questioned about the message.

¶ 8        Sluis testified that several other messages appeared on the Facebook page on March 5, 2013. One read, " 'I nominate Tony DiMeo as the person we (literally) throw under a bus.' " Sluis identified DiMeo as a North Central College student, but she did not know who posted the message. The administration had spoken to DiMeo previously about other messages on the page that mentioned him, but there was no investigation into who had posted the message of March 5, 2013. The trial court admitted printouts of the Facebook page for March 5, 2013.

¶ 9        The State then called Richard Wistocki, a Naperville police detective, who testified as follows. On March 5, 2013, he visited the "North Central Confessions" page and uploaded an "exigent circumstance letter" to Facebook. Wistocki was concerned because "over the last ten years prior every school shooter ha[d] had some kind of post on social media." Wistocki wanted to find out who was bringing a gun to North Central College every day, and he interpreted "bag" to mean a body bag. He eventually came up with defendant's name, e-mail address, and cell phone number. Wistocki never investigated who posted the message about DiMeo.

¶ 10        Wistocki testified that he called defendant. Defendant admitted that he administered the "North Central Confessions" page. Wistocki told him about the post. Defendant responded that the post was "a joke" and that "[e]veryone knows if you post something on Facebook it's a joke." Asked who had connected him with the Facebook page, defendant eventually named Balaskas, a friend who attended North Central College. He said that he owned no guns. Wistocki never asked defendant whether he had intended to frighten anybody by posting the message.

¶ 11        Wistocki testified that he obtained Balaskas's permission to access her Facebook account. He read an exchange from the evening of March 5, 2013, between her and defendant. Defendant told Balaskas that the police would be contacting her about his post and that she should deny that she had anything to do with it, which was the truth. He apologized for getting her involved with the investigation and said that he would take all the consequences of his act.

¶ 12        Wistocki testified that, on March 29, 2013, he participated in arresting defendant at defendant's home in Madison, Wisconsin. Wistocki and a special agent interviewed defendant at the police station. After signing a rights waiver, defendant was interviewed. At trial, excerpts of the interview were played for the jury. In the interview, defendant admitted posting the message at issue. Wistocki reminded him of their phone conversation, in which defendant had asked Wistocki why the police would waste time and resources on the matter. Defendant responded that he was still wondering. Wistocki pointed out that schools these days were sensitive about threats of violence in light of Sandy Hook and other shootings. Defendant said,

"I get why people are upset [with his post], I just don't get—this." By "this" he meant "why it's come to this," *i.e.*, the arrest.

¶ 13 The State rested, and defendant put on no evidence. In closing argument, the prosecutor told the jurors that the judge would instruct them that the State had to prove that defendant had knowingly transmitted a threat of violence directed against persons at school and that he had intended to place those persons in reasonable apprehension of violence. The prosecutor contended that the first proposition was obvious from the content of the post. The second was plainly inferable: defendant could have had no intent other than to scare people at North Central College. He had in fact done so: Sluis, campus safety, and Wistocki all took the message as a serious threat. Moreover, in 2010, defendant had posted a list of people whom he wanted to kill and had been suspended for it, so he knew what he was doing on March 5, 2013.

¶ 14 Defendant argued that his action resulted from his immaturity and poor social skills. His conduct did not prove that he wanted to scare people; it was "venting," as had been his expression of a desire to kill the Pope and God. Defendant resembled a child who lived a "fantasy life." Although common sense might tell someone that the message that he posted on March 5, 2013, would make people afraid, common sense was what people like him lacked. Moreover, Wistocki had never asked him what he had intended or whether he had meant to scare people. Defendant might have acted negligently or recklessly, but no more.

¶ 15 Among the instructions that the court gave the jury were the following. First, "[a] person commits the offense of disorderly conduct when he knowingly transmits a threat of violence directed against persons at his school whether or not school is in session and he intends that the threat would place those persons in reasonable apprehension of violence." Second, "[a] threat is knowingly transmitted if the defendant transmitted a communication for the purpose of issuing a threat of violence directed at persons at a school and with knowledge that the transmitted communication will be viewed as a threat of violence directed at persons at a school."

¶ 16 The jury found defendant guilty. The court denied his posttrial motion and sentenced him to 30 months' probation. Defendant timely appealed.

¶ 17 On appeal, defendant contends first that the school-threat law is unconstitutional on its face because it does not require a sufficient mental state. Defendant argues in part that under *Elonis* and *People v. Relerford*, 2017 IL 121094, the statute violates constitutional guarantees of free speech (see U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4) because the State need prove only that a defendant knew that he was transmitting a threat, without having to prove that he actually intended to make the recipient feel threatened.[1] Defendant also argues that the statute violates substantive due process (see U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) by allowing a conviction to be based on wholly innocent conduct. This argument too is based on the lack of a sufficient mental state.

---

[1]We recognize that the trial court instructed the jury that the State had to prove beyond a reasonable doubt that defendant did intend to make recipients of his message feel threatened. As we shall explain, the statute under which defendant was charged does not actually impose such a requirement on the State and need not do so in order to pass constitutional scrutiny. However, as defendant challenges the facial validity of the law, the instructions that the jury was given in his case do not affect our analysis of his argument on appeal.

¶ 18 Whether a statute is constitutional is a question of law, so our review is *de novo*. *People v. Dinelli*, 217 Ill. 2d 387, 397 (2005).

¶ 19 II. ANALYSIS

¶ 20 Defendant contends in part that the statute violates the first amendment and the Illinois free speech clause. For our purposes, there is no need to differentiate between the federal and state constitutional provisions, as any difference would not affect our analysis.[2]

¶ 21 To decide whether a statute is constitutional, a court must first construe it. *People v. Minnis*, 2016 IL 119563, ¶ 25. A statute is presumed constitutional, and we have a duty to construe it so as to uphold its constitutionality if there is a reasonable way to do so. *Id.* ¶ 21.

¶ 22 There is a reasonable construction of the statute here that obviates any constitutional infirmity. Although defendant contends that the school-threat provision lacks a sufficient *scienter* requirement, the State correctly points out that we have held otherwise.

¶ 23 In *People v. Diomedes*, 2014 IL App (2d) 121080, ¶ 3, the defendant was charged with disorderly conduct for e-mailing a threat of violence against the dean of his former school, Geneva High. The e-mail was sent to an anti-bullying activist who had spoken there some time earlier. In the message, he said that he had been expelled from the school, and he expressed frustration with his new alternative school. His e-mail concluded:

> " 'I was in the counselor's office the other day because I was writing suicide notes, a will, and who I was going to kill. I planned not to hurt any kids, I just want the dean at Geneva, my grandparents, and my mother dead. I'm the one who has suffered my whole life, now I want them to suffer.' " *Id.* ¶ 6.

¶ 24 The trial court found the defendant guilty. On appeal, he contended first that the State did not prove that he had " 'knowingly *** transmitted a threat.' " *Id.* ¶ 21 (quoting 720 ILCS 5/26-1(a)(13) (West 2010)). He argued that the State needed to prove both that he knowingly sent the e-mail and that, when he did so, he knew that he was transmitting a threat. He contended that a rational fact finder could not conclude beyond a reasonable doubt that he had done the latter, as opposed to merely expressing frustration to a third party and seeking help for his depression. *Id.*

¶ 25 We held first that "knowingly" applied to all of the elements of the offense. Thus, the State had had to prove that the defendant had actually known that the message was a threat. *Id.* ¶ 23. We concluded that the trial court had properly so found. We explained that, in one sentence, the defendant wrote that he presently wanted the dean dead (or to suffer) and that, in the previous sentence, he wrote that he had a list of people whom he wanted to kill (or make suffer), again expressing a present desire. Thus, the court could find that the defendant knowingly made a present threat of injury or death to the dean and the other people specified. *Id.* ¶ 26. As further evidence of his knowledge, the e-mail noted that he had previously been

---

[2]In *People v. DiGuida*, 152 Ill. 2d 104, 120-23 (1992), the supreme court noted that the framers of the 1970 constitution appeared to have intended that the free speech clause provide greater protections than does the first amendment. The court did not, however, rely on any such intent and actually held that the state clause, like the federal one, does not apply to private action. *Id.* at 123-24. More recently, the court has cast doubt on whether the state guarantee should be read more expansively than the federal one. *City of Chicago v. Alexander*, 2017 IL 120350, ¶ 33.

expelled for posting a threat online and had been sent to the school counselor because he had compiled a list of people whom he planned to kill. *Id.* ¶ 27.

¶ 26　　We then turned to the defendant's argument that his conviction was unconstitutional because his e-mail was protected by the first amendment. This issue turned on the application of the principle that the first amendment allows restrictions on " 'true threats,' " which:

> " 'encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.' " *Id.* ¶ 30 (quoting *Virginia v. Black*, 538 U.S. 343, 359-60 (2003)).

¶ 27　　We then noted the split of authority on whether a true threat is one that a reasonable speaker would foresee would cause a reasonable recipient to interpret as a serious expression of an intent to inflict harm (as the defendant asserted) (*id.* ¶ 31) or one that a reasonable recipient would interpret as such (*id.* ¶ 32). We observed that both definitions of a "true threat" were objective, focusing on what a reasonable person (whether the speaker, the recipient, or both) would foresee or perceive. *Id.* ¶¶ 33-35. But, even applying the defendant's two-pronged definition, we concluded that he had been proved guilty of communicating a true threat: a reasonable speaker would foresee that a recipient would interpret his message as a serious expression of intent to harm. *Id.* ¶¶ 35-36.

¶ 28　　As pertinent to the first issue in this appeal, *Diomedes* implicitly held that the school-threat provision of the disorderly conduct statute is not facially unconstitutional. The provision can and may be applied to the knowing communication of a message if the defendant knows that a reasonable speaker would foresee the message as communicating, to a reasonable recipient, a serious intent to commit harm. Thus, under *Diomedes*, the provision includes a mental-state requirement that is consistent with the first amendment. The intent to threaten is not essential; the knowledge that the communication is a "true threat" is sufficient.

¶ 29　　In *People v. Wood*, 2017 IL App (1st) 143135, the defendant was convicted of threatening the judge who had presided over his criminal case. As pertinent here, the statute required the State to prove that (1) he had knowingly and willfully communicated a threat to a public official and (2) the threat would place the official in reasonable apprehension of immediate or future bodily harm. *Id.* ¶ 11; see 720 ILCS 5/12-9(1)(a)(1)(i) (West 2012). The appellate court held that he had not been proved guilty beyond a reasonable doubt. As pertinent here, the court observed that a conviction required "intentionality on the defendant's part," *i.e.*, the making of a true threat. *Wood*, 2017 IL App (1st) 143135, ¶ 13; see *People v. Dye*, 2015 IL App (4th) 130799, ¶ 10. In turn, per the Supreme Court, a "true threat" is "a communication in which 'the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' " (Emphases and internal quotation marks omitted.) *Wood*, 2017 IL App (1st) 143135, ¶ 13 (quoting *Dye*, 2015 IL App (4th) 130799, ¶ 9, quoting *Black*, 538 U.S. at 359).

¶ 30　　The statute at issue in *Wood* differs from the one here in that it explicitly requires that the offending communication be of such a character as to place the recipient in reasonable apprehension of harm. Nonetheless, in its construction of "threat," *Wood* is consistent with our opinion in *Diomedes*. Both opinions follow the command of our supreme court to construe a

- 6 -

statute to uphold its constitutionality if reasonably possible. *Minnis*, 2016 IL 119563, ¶ 21. *Wood* is also of value because the statute at issue in that case addresses the same subject matter as the one here, and statutes that address related subjects, even if not strictly *in pari materia*, should be construed consistently (*JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 470 (2010)). Thus, as used in each statute, the combination of the terms "knowingly" and "threat" requires the State to prove that (1) the defendant knowingly made the statement and (2) the statement was a true threat.

¶ 31    We return to the interpretation of the school-threat provision as a whole. The existence of a true threat is one element. As we held in *Diomedes*, there is also the requirement that the defendant *knowingly* transmit a true threat and not merely that he *should* know that he is doing so. *Diomedes*, 2014 IL App (2d) 121080, ¶ 23. Thus, if the defendant does not know that he is transmitting a true threat, which is unprotected by the first amendment, he is not guilty. (Of course, he need not know that his message is unprotected by the first amendment. He need realize only that it is of a certain character. Knowledge of the first amendment is not an element, and ignorance of the first amendment is not a defense.)

¶ 32    Insofar as this case is governed by *Diomedes* and *Wood*, the school-threat provision of the disorderly conduct statute is constitutional. The provision does not punish protected conduct because it applies only to communications that are true threats, which are unprotected. It also requires the State to prove that the defendant knew that he was transmitting a true threat.

¶ 33    The cases upon which defendant relies do not call the validity of the provision into question. In *Elonis*, the defendant was convicted of violating a federal statute that makes it a crime to transmit " 'any communication containing any threat…to injure the person of another.' " *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2004 (quoting 18 U.S.C. § 875(c) (2006)). The Court framed the issues as whether the statute required that the defendant be aware of the threatening nature of the communication and, if not, whether the first amendment required such a showing. The Court resolved the first issue by reading in a *scienter* requirement; thus, it did not reach the second issue.

¶ 34    The Court noted that the statute did not specify a mental state; in particular, it did not say whether the defendant must intend that his communication contain a threat. *Id.* at ___, 135 S. Ct. at 2008. Nonetheless, based on the general rule that a guilty mind is required for a criminal offense, and the need to avoid criminalizing apparently innocent conduct by those who do not know the facts that make their conduct blameworthy, the Court had long construed criminal statutes that lacked a mental state to include " 'only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.' " (Internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 2010 (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)).

¶ 35    Applying this reasoning, the Court pointed out that the defendant's conviction had been based solely on how his posts would have been understood by a reasonable person. This standard, negligence, was disfavored in criminal statutes. *Id.* at ___, 135 S. Ct. at 2011. What was acceptable was a higher standard: the mental-state requirement of the federal statute is satisfied if the defendant transmits a communication "for the *purpose* of issuing a threat, or with *knowledge* that the communication will be viewed as a threat." (Emphases added.) *Id.* at

___, 135 S. Ct. at 2012.[3] Given its construction of the statute, the Court saw no need to reach any first amendment issues. *Id.* at ___, 135 S. Ct. at 2012.

¶ 36    Insofar as *Elonis* applies here, it does not help defendant. Without directly considering first amendment issues, the Court implicitly held that, by requiring (1) the mental state of either intent or knowledge and (2) the communication of a threat to injure another person, both first amendment problems and the danger of criminalizing innocent conduct were obviated. Nothing in *Elonis* is inconsistent with *Diomedes* and *Wood*; indeed, they essentially said the same thing. The primary difference is that in *Elonis*, the Court read a mental state of intent or knowledge into a statute that prohibited communicating threats, whereas in *Diomedes* and *Wood* the courts recognized that the statutes already contained the mental state of knowledge.

¶ 37    *Relerford* does not aid defendant either. There, the supreme court addressed subsection (a) of the stalking statute, under which a person commits stalking if he or she knowingly engages in a course of conduct directed at a specific person and he or she knows or should know that this course of conduct would cause a reasonable person to (1) fear for his or her safety or the safety of a third person or (2) suffer other emotional distress. *Relerford*, 2017 IL 121094, ¶ 28; see 720 ILCS 5/12-7.3(a)(1), (a)(2) (West 2012). A "course of conduct" includes, among other things, two or more nonconsensual communications to or about the specific person. *Relerford*, 2017 IL 121094, ¶ 28; see 720 ILCS 5/12-7.3(c)(1) (West 2012). Thus, subsection (a)(1) was not limited to unprotected speech: "a communication to or about a person that negligently would cause a reasonable person to suffer emotional distress," without more, is not a true threat as the Supreme Court has defined that term. *Relerford*, 2017 IL 121094, ¶ 38; see *Black*, 538 U.S. at 359. However, subsection (a)(2) did separately cover the making of true threats, which are not protected. *Relerford*, 2017 IL 121094, ¶ 39.

¶ 38    The court turned to whether subsection (a) was facially invalid for substantial overbreadth, *i.e.*, prohibiting constitutionally protected speech as well as unprotected speech and thus chilling the free exercise of the former. *Id.* ¶ 50. The court concluded that subsection (a) was overly broad because it criminalized "any number of commonplace situations" that clearly fell within the first amendment (*id.* ¶ 52), such as attending a town meeting and repeatedly criticizing a business (*id.* ¶ 53) and much other "core political speech" (*id.* ¶ 55). Moreover, subsection (a) could not be saved by giving it a plausible limiting construction. *Id.* ¶ 60. Thus, subsection (a), and the corresponding subsection of the cyberstalking statute (720 ILCS 5/12-7.5(a) (West 2012)), were facially invalid. *Relerford*, 2017 IL 121094, ¶ 63. The court therefore struck the phrase " 'communicates to or about' " from those provisions. *Id.* ¶ 78.

¶ 39    *Relerford* simply does not apply here. The school-threat subsection of the disorderly conduct statute does not suffer from overbreadth; requiring both knowledge and true threats limits its reach to criminalizing only speech that the speaker knows is inherently non-innocent. (Of course, as noted earlier, the speaker need not realize that first-amendment doctrine says that his speech is unprotected.)

¶ 40    Finally, we discuss two opinions that defendant cites that held statutes unconstitutional for violating substantive due process. In *People v. Madrigal*, 241 Ill. 2d 463 (2011), a statutory subsection provided that a person committed identity theft when he or she " 'knowingly ***

---

[3]In disapproving mere negligence and approving either intent or knowledge, the Court declined to consider whether the intermediate mental state of recklessness would be sufficient. *Id.* at ___, 135 S. Ct. at 2012.

use[d] any personal identification information *** of another' " without the other person's consent in order to gain access to any record of the other person's actions or communications. *Id.* at 464 (quoting 720 ILCS 5/16G-15(a)(7) (West 2008)). The court noted that, beyond the knowing use of the information, the provision required no mental state or criminal purpose. *Id.* at 470-71. Therefore, it criminalized "a wide array of wholly innocent conduct" (*id.* at 471), such as doing an Internet search to find out how a friend did in the Chicago Marathon (*id.* at 472). Thus, the provision lacked a rational relation to the legislative purpose of preventing identity theft. *Id.* at 473.

¶ 41　　In *Carpenter*, a statute made it unlawful for a person to operate any motor vehicle that he or she knew had a false or secret compartment, which was intended for concealment. See 625 ILCS 5/12-612 (West 2004). The court concluded that the purpose of the law was to combat the concealment of illegal or dangerous items in such a compartment, but the provision was not reasonably related to accomplishing that objective, as it criminalized much innocent conduct. A person might use a secret compartment to advance a perfectly legitimate interest in keeping legal or innocuous items out of the view of the general public, including law enforcement officers. *Carpenter*, 228 Ill. 2d at 269-70. Also, the court refused to read the requirement of a criminal purpose into the statute; unlike cases in which courts had read mental states into statutes that included none, *Carpenter* involved a statute that already included a mental state (two, indeed: knowledge and intent). *Id.* at 270. Thus, the statute's fatal flaw—its criminalization of innocent conduct—could not be cured by construction.

¶ 42　　Also pertinent here, the *Carpenter* court contrasted the statute that it had struck down with one that the supreme court had upheld. This latter law prohibited a person from stalking another person in furtherance of a threat that he had transmitted to the target with the intent to place him or her in reasonable apprehension of death or other physical harm. *Id.* at 271; see *People v. Bailey*, 167 Ill. 2d 210 (1995) (upholding 720 ILCS 5/12-7.3 (West 1992)). The court distinguished *Bailey* on the basis that the stalking statute there did not criminalize innocent conduct: "threats made with the intent [specified] could hardly be deemed 'innocent conduct' under any rational interpretation of the phrase," and the requirement of knowledge limited its application to those who knew that they were engaging in noninnocent conduct. *Carpenter*, 228 Ill. 2d at 272.

¶ 43　　The school-threat subsection of the disorderly conduct statute is crucially dissimilar to the laws struck down in *Madrigal* and *Carpenter*—but quite similar to the one upheld in *Bailey*. Requiring knowledge and limiting criminal actions to the making of true threats limits the provision to the knowing performance of an act that is not innocent. The provision violates neither the first amendment nor the requirement of substantive due process. Defendant's first claim of error fails.

¶ 44　　We turn to defendant's second claim of error: that he was not proved guilty beyond a reasonable doubt. Defendant argues first that the State did not prove that he intended to communicate a true threat. He argues second that the State did not prove that the message actually communicated a true threat.

¶ 45　　In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992). The trier of fact is responsible for determining witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn

from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 46 Defendant's first argument requires some preliminary comment. Although we have held that the school-threat statute incorporates the mental state of *knowledge*, defendant's case was tried on the theory that the State had to prove *intent*, a higher standard. The statute required the State to prove that defendant *knowingly* communicated a true threat—that he knew that his words were a serious expression of an intent to cause harm. The instructions told the jury that the State also had to prove that he *intended* that his words cause such apprehension. In other words, the jury instructions rewrote the statute in defendant's favor. Fortunately, however, we need not decide whether the issue on appeal is the sufficiency of the proof of the offense as defined by the statute or the sufficiency of the offense as redefined by the jury instructions. The evidence was sufficient either way.

¶ 47 The jury could reasonably have concluded that, when defendant sent his message, he knew that it was a serious expression of an intent to do harm. (Indeed, even defendant conceded that he understood why people were upset by his message.) The jury could have inferred that defendant knew that his message, which told people that he came to school every day with a gun and was going to use it on somebody, was such an expression of an intent to do harm. That the message was sent anonymously did not make it less of a threat; indeed, it conveyed the reasonable impression (albeit incorrect) that the sender was a student at North Central College.

¶ 48 Thus, the jury did not exceed its prerogative in finding that defendant knew that his promise to kill someone would cause a reasonable recipient to fear violence to the community. Further, the jury reasonably inferred that defendant *intended* his message to cause at least some people to fear violence, as that was a natural and foreseeable reaction to a person telling them that he went to campus every day armed with a firearm and was bound to use it on slight provocation. A jury may infer that a defendant intended the natural and probable consequences of his act. *People v. Foster*, 168 Ill. 2d 465, 484 (1995). Defendant's self-serving statements otherwise did not require the jury to entertain a reasonable doubt of his intent.

¶ 49 Defendant's second argument is that the evidence did not prove beyond a reasonable doubt that his message was a true threat. Defendant cites *Dye*, 2015 IL App (4th) 130799, in which the court reversed the defendant's conviction of threatening a public official (720 ILCS 5/12-9 (West 2012)). The court held that the State had not proved beyond a reasonable doubt that the defendant made a true threat when he told his public defender " 'I'm gonna get you.' " *Dye*, 2015 IL App (4th) 130799, ¶ 12. The court reasoned that the words were ambiguous because they could as easily refer to nonviolent retribution, as they often do in common usage. *Id.* ¶¶ 11-12. Although the jury had the prerogative to make reasonable inferences from the evidence, it could not engage in "random speculations" that were "like flipping a coin." *Id.* ¶ 12. Thus, the State had not proved beyond a reasonable doubt that the defendant's words had been a true threat.

¶ 50 Defendant asserts that, like the statement "I'm gonna get you" in *Dye*, his statement " '[s]omeday someone is going to p*** me off and end up in a bag' " was so ambiguous that the jury could not have inferred beyond a reasonable doubt that it referred to a violent act. He suggests that the word "bag" did not necessarily refer to a body bag, as Wistocki had believed, but "could also have meant 'trick bag' or had some other innocuous meaning." We disagree. Reading the statement in context, a reasonable fact finder could conclude beyond a reasonable doubt that "bag" meant a body bag. The most natural interpretation of the message—probably

the *only* interpretation that is not wholly *unnatural*—is that the sender carried a gun to school every day and someday would get angry enough to use it. The jury was not required to ignore common sense and defer to the ridiculous. Therefore, we hold that defendant was proved guilty beyond a reasonable doubt.

¶ 51                                            III. CONCLUSION

¶ 52        For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 53        Affirmed.