2019 IL App (1st) 160184

No. 1-16-0184

Second Division
July 25, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 6760 |
| | ) | |
| BRIAN CRAWFORD, | ) | Honorable |
| | ) | Frank Zelezinski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Hyman and Mason concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant Brian Crawford was found guilty of stalking (720

ILCS 5/12-7.3(a)(1) (West 2014)) and cyberstalking (*id.* § 12-7.5(a)(2)). The trial court merged

the counts and sentenced defendant on the cyberstalking count to two years in prison. On appeal,

defendant contends we should vacate his conviction because the cyberstalking statute under

which he was convicted is facially unconstitutional. He argues that subsection (a) of the statute

(1) violates due process because it allows a felony conviction for the mere negligent infliction of

emotional distress and (2) violates the first amendment because it is an overbroad prohibition on speech. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant was initially charged with one count of attempted first degree murder, two counts of stalking, and four counts of cyberstalking. The State proceeded at trial on single counts of attempted first degree murder, stalking, and cyberstalking.

¶ 4    The State charged defendant with stalking based on the allegation that he made several phone calls and text messages threatening to kill the victim and that he knew or should have known that his course of conduct would cause a reasonable person to fear for his or her safety. It charged defendant with cyberstalking based on the allegation that he sent the victim several threatening text messages saying he was going to kill her and that he knew or should have known that this course of conduct would cause a reasonable person to suffer emotional distress.

¶ 5    At trial, Iceiss Sieler testified that, on March 25, 2015, she had an "off and on" relationship with defendant for over 18 years and had two children with him. Defendant stayed at her apartment in Matteson, Illinois, about five to six times per week. She was not in a long-term relationship with him because she was pursuing a relationship with her boyfriend, Jonathan.[1] Sieler did not ask defendant to leave her home because he did not have anywhere else to go and he was helping support their children.

¶ 6    On March 25, 2015, Sieler first saw defendant at his hotel room, where they had a sexual relationship and he gave her rent money. They left the hotel to attend a parent-teacher conference at their son's school, after which Sieler dropped defendant off at his mother's house in Chicago. Sieler told defendant she would pick him up that evening. Sieler returned to her house, and at

---

[1] Jonathan's full name is not contained in the record.

around 8:30 p.m., she left to meet Jonathan in Chicago. When Sieler was with Jonathan, defendant called her, but she did not answer because she was having a good time and did not want to be bothered.

¶ 7     Defendant sent Sieler several text messages that night, and she read them in court. At 2:36 a.m., defendant's text messages stated: "U GONE DIE," "I WILL F*** MURDER U" and "Dont give a f*** who u tell." At 2:46 a.m., defendant's text message stated: "GET READY TO MEET YOUR MAKER. . . I know how much u love that song (take me to the king) lets make it a reality" and, at 2:47 a.m., he stated, "Join YO MFN MOMMA N YO COUSIN B***." At 2:54 a.m., defendant's text messages stated: "Its not a matter of 'if' i catch u but 'when' and when i do, uts gone be ugly and im already prepared to go *** jail for doing it."

¶ 8     Sieler testified that defendant's text messages did "[n]ot really" upset her and she was not scared. When Sieler was driving home to Matteson that night, she stopped a police officer and asked him to escort her home because she thought defendant was at her home and she did not "feel like being bothered" with him. She testified she was "highly intoxicated" and wanted defendant out of her house so Jonathan could come over. When Sieler was talking to the officer, defendant called her, and she put the call on speakerphone. The officer followed Sieler home. When Sieler arrived home, she asked her son, who was lying on the couch, if he was okay and told the officer that defendant's jacket was there. Defendant walked out of the kitchen, which was about 20 feet away, with a knife in his hands and stood there. Sieler testified that she physically fought with defendant "pretty often" and defendant had previously threatened to kill her. She did not take the previous threats seriously.

¶ 9 Matteson police officer Murray testified that, on March 26, 2015, he was on patrol when Sieler got his attention and told him she needed help.[2] She was crying and upset and told him she was scared to go home because her ex-boyfriend had sent her threatening text messages. When Murray was talking with Sieler, defendant called her, and she put the telephone call on speakerphone. Murray heard defendant say to Sieler two times "I will kill you." Sieler asked defendant why he wanted to kill her, and he repeated, "I will kill you," and ended the telephone call. Sieler asked Murray to escort her home because she was concerned defendant was there. Murray called Matteson police sergeant Ken Arvin for backup, and they followed Sieler home.

¶ 10 Sieler fumbled with her keys and was shaking when she opened her apartment door. There were two children sleeping on couches in the living room. Sieler asked one of them if everything was okay and told Murray that defendant's jacket was on the chair. Defendant jumped out from around the wall in the kitchen and growled. He was holding a knife in his hands and was bending forward at his waist with his arms extended out in front of him. Murray pointed his gun at defendant and ordered him to drop the knife several times. Defendant eventually dropped the knife and surrendered. When Murray was placing defendant into custody, defendant stated that they "could not keep him locked up forever" and he "would get to her and it would not end well for her."

¶ 11 Matteson police officer Rankin testified that, on March 26, 2015, when he was processing defendant at the police station, defendant stated "I would take care of her."[3] Rankin told defendant that he should not threaten his girlfriend because he would have to document it.

---

[2]Officer Murray's first name is not included in the record.
[3]Officer Rankin's first name is not included in the record.

Defendant told him it was okay, "it was already in the text messages," and the "police cannot stop things from happening."

¶ 12    Matteson police sergeant Ken Arvin testified that, on March 26, 2015, he entered Sieler's apartment with Sieler and Murray. Later that day when defendant was in lockup, defendant told Arvin that he was sorry for what had happened. Arvin asked him, "Do you have any idea how close you came to getting shot?" Defendant apologized and told Arvin he thought "it was [Sieler] and her boyfriend and did not realize that the police were in the apartment." Matteson police detective Sean White testified that, on March 26, 2015, at 3:45 p.m., he spoke with defendant at the police station in the presence of an assistant state's attorney. He identified the videotaped statement that Sieler made, and the State played portions of the video for purposes of impeaching certain parts of Sieler's testimony.

¶ 13    The court granted defendant's motion for a directed verdict with respect to the attempted first degree murder count. Following argument, the court found defendant guilty of stalking and cyberstalking. The court subsequently denied defendant's motion for a new trial, merged the stalking count into the cyberstalking count, and sentenced defendant to two years in prison.

¶ 14                                    II. ANALYSIS

¶ 15    Defendant contends that, because subsection (a) of the cyberstalking statute under which he was convicted allows a felony conviction for the mere negligent infliction of emotion distress, it sweeps in innocent conduct and therefore violates due process. Defendant also contends that subsection (a) violates the first amendment because it is an overbroad prohibition on speech. After defendant filed his opening brief and before the State filed its initial response brief, our supreme court filed *People v. Relerford*, 2017 IL 121094, which addressed the constitutionality

of subsection (a) of the stalking and cyberstalking statutes. We allowed the parties to file supplemental briefs.

¶ 16    Initially, we note that the trial court merged the stalking count into the cyberstalking count and sentenced defendant only for cyberstalking. In defendant's opening brief, he argues we should vacate his convictions for cyberstalking and stalking. However, in defendant's supplemental brief, he withdrew his argument regarding the stalking count and acknowledged that, because the trial court did not impose sentence on the stalking count, we do not have jurisdiction to decide the validity of defendant's unsentenced guilty finding on the stalking count. See *id.* ¶¶ 74-75.

¶ 17    We also note that, although defendant did not raise his constitutional claims in the trial court, a party may raise a challenge to the constitutionality of a statute at any time. *People v. Bryant*, 128 Ill. 2d 448, 454 (1989). Before we address *Relerford* and defendant's claims, we first discuss the relevant statutory provision in the cyberstalking statute under which defendant was convicted.

¶ 18                          A. Cyberstalking Statute

¶ 19    The cyberstalking statute, under which defendant was convicted, stated, in relevant part:

          "(a) A person commits cyberstalking when he or she engages in a course of conduct using electronic communication directed at a specific person, and he or she knows or should know that would cause a reasonable person to:

                    (1) fear for his or her safety or the safety of a third person; or

                    (2) suffer other emotional distress.

(a-3) A person commits cyberstalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions, harasses another person through the use of electronic communication and:

(1) at any time transmits a threat of immediate or future bodily harm, sexual assault, confinement, or restraint and the threat is directed towards that person or a family member of that person; or

(2) places that person or a family member of that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint; or

(3) at any time knowingly solicits the commission of an act by any person which would be a violation of this Code directed towards that person or a family member of that person." 720 ILCS 5/12-7.5(a), (a-3) (West 2014).

Before *Relerford*, the statute defined "course of conduct" as

"2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. The incarceration in a penal institution of a person who commits the course of conduct is not a bar to prosecution under this Section." 720 ILCS 5/12-7.5(c)(1) (West 2014).

The statute defined "non-consensual contact" as

"any contact with the victim that is initiated or continued without the victim's consent, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on

private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased, or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim." 720 ILCS 5/12-7.5(c)(5) (West 2014).

The statute defined "emotional distress" as "significant mental suffering, anxiety or alarm." 720 ILCS 5/12-7.5(c)(3) (West 2014).

¶ 20    Here, defendant was convicted of violating subsection (a)(2) of the above cyberstalking statute. Subsection (a) does not include a mental state for the "course of conduct" element, and the State asserts that we may construe subsection (a) of the statute to require "knowingly" as the mental state for the course of conduct element. We agree that we may imply the mental state of knowledge as the mental state for the course of conduct element.

¶ 21    When construing a statute, the primary objective is to ascertain and give effect to the legislature's intent in enacting it. *Relerford*, 2017 IL 121094, ¶ 30. When construing a statute, we must, "if feasible, interpret the act in a way that preserves its constitutionality." *People v. Anderson*, 148 Ill. 2d 15, 22 (1992). We begin with the presumption that the statute is constitutional. *Id.*

¶ 22    Under section 4-3 of the Criminal Code of 2012, if a statute "does not prescribe a particular mental state applicable to an element of an offense (other than an offense which involves absolute liability), any mental state defined in Sections 4-4, 4-5 or 4-6 is applicable." 720 ILCS 5/4-3(b) (West 2014); see *In re S.M.*, 347 Ill. App. 3d 620, 626 (2004). Sections 4-4, 4-5, and 4-6 include, respectively, definitions for "Intent," "Knowledge," and "Recklessness." 720 ILCS 5/4-4, 4-5, 4-6 (West 2014); *Anderson*, 148 Ill. 2d at 23. Section 4-9 of the Criminal Code of 2012, the section governing absolute liability, states as follows:

"A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor \*\*\*, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4-9 (West 2014).

Here, cyberstalking is a class 4 felony, subject to a sentencing range of one to three years in prison. 720 ILCS 5/12-7.5(b) (West 2014); 730 ILCS 5/5-4.5-45(a) (West 2014). Therefore, because the offense is not a misdemeanor, we will imply a mental state requirement unless the statute defining the offense shows a clear legislative purpose to impose absolute liability. See *Anderson*, 148 Ill. 2d at 24.

¶ 23 The "degree of punishment is a significant factor to consider in determining whether a statute creates an absolute liability offense" (*People v. Sevilla*, 132 Ill. 2d 113, 122 (1989)), and under the cyberstalking statute, a defendant could be sentenced to one to three years in prison for committing cyberstalking. Further, under subsection (a) of the cyberstalking statute, a defendant must know or should know that his conduct would cause a reasonable person to "fear for his or her safety or the safety of a third person" or "suffer other emotional distress." Thus, given that the cyberstalking statute requires that a person know or should know that his conduct would cause a reasonable person to fear for his safety or suffer emotional distress, and given that a defendant could face one to three years in prison, the statute does not indicate a clear legislative purpose for imposing absolute liability for the offense. Thus, we may imply a mental state for the course of conduct element. See *Anderson*, 148 Ill. 2d at 24.

¶ 24 When determining which mental element is implied, we may examine the language of any parallel statute. *Sevilla*, 132 Ill. 2d at 123-24. The legislative history supports the conclusion

that the cyberstalking and stalking statute are parallel statutes, as the legislature enacted the cyberstalking statute to include electronic communications as a means by which a defendant could commit stalking. 92d Ill. Gen. Assem., House Proceedings, May 8, 2001, at 7 (statements of Representative Schoenberg) (the cyberstalking statute " 'incorporates the use of electronic technology, like computers, hand-held personal data assistants, as vehicles through which the crime of stalking could be committed. The penalties would remain consistent with the existing statute for stalking.' "). The cyberstalking statute is "based on similar language" to subsection (a) of the stalking statute (see *Relerford*, 2017 IL 121094, ¶ 63) and subsection (a) of the stalking statute requires knowledge as a mental state for the course of conduct element (720 ILCS 5/12-7.3(a) (West 2014)). Thus, the language of the parallel stalking statute supports our conclusion that we may imply knowledge as the mental state for the course of conduct in the cyberstalking statute.

¶ 25     Further, when discussing the 2010 amendments to the cyberstalking and stalking statutes, Senator Hutchinson stated that the amendment

> "redefines *stalking*, aggravated stalking, and *cyberstalking* as *knowingly* engaging in a course of conduct directed at a specific person, where the defendant knows or should know that this course of conduct would cause a reasonable person to either fear for their safety or for the safety of a third party or to suffer emotional distress." (Emphases added.) 96th Ill. Gen. Assem., Senate Proceedings, May 21, 2009, at 125 (statements of Senator Hutchinson).

Thus, the legislative history supports our conclusion that the legislature intended to include "knowingly" as the required *mens rea* for the course of conduct element in subsection (a) of the cyberstalking statute, as it did for the stalking statute.

¶ 26    Accordingly, we will imply the mental state of knowledge for the course of conduct element in subsection (a) of the cyberstalking statute. See *Anderson*, 148 Ill. 2d at 24 (where the statute did not specify a culpable mental state, the court found that the State was required to prove recklessness, knowledge, or intent); *In re S.M.*, 347 Ill. App. 3d at 626 (where the defendant argued that the statute violated due process because it required no culpable mental state, the court implied the mental state of knowledge to satisfy the *mens rea* element).

¶ 27                                      B. Due Process

¶ 28    As previously discussed, we allowed the parties to file supplemental briefs after our supreme court filed *Relerford*, 2017 IL 121094, which addressed the constitutionality of the cyberstalking and stalking statutes.

¶ 29                              1. *Relerford* and Due Process

¶ 30    In *Relerford*, the defendant was found guilty of violating subsections (a)(1) and (a)(2) of the cyberstalking statute and similar provisions in the stalking statute. *Id.* ¶ 3. The supreme court found that the statutes violated the first amendment but reversed this court's reasoning that the statutes violated due process. *Id.* ¶¶ 22, 63.

¶ 31    On the defendant's appeal to the appellate court, this court found that subsections (a)(1) and (a)(2) of the cyberstalking and stalking statutes violated due process based on the United States Supreme Court decision in *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001 (2015). *Relerford*, 2017 IL 121094, ¶ 19. In *Elonis*, the Supreme Court addressed the issue of which mental state it should infer to apply in a federal statute that did not specify a required mental state. *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2009; *Relerford*, 2017 IL 121094, ¶ 20. In its analysis, the court stated that federal courts "have long been reluctant to infer that a negligence

standard was intended in criminal statutes." (Internal quotation marks omitted.) *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011.

¶ 32 This court stated that, under the cyberstalking and stalking statutes, an individual's conduct is criminal only if the defendant " 'knows or should know' " that it would cause a " 'reasonable person' " to suffer emotional distress. *People v. Relerford*, 2016 IL App (1st) 132531, ¶ 26 (quoting 720 ILCS 5/12-7.3(a)(2) (West 2012)). Citing *Elonis*, this court therefore concluded that subsections (a)(1) and (a)(2) of the cyberstalking statute and similar provisions in the stalking statute did not require that the individual actually intend to inflict emotional suffering on another and that the statutes "bypass[ ] 'the conventional requirement for criminal conduct—*awareness* of some wrongdoing' in favor of a reasonable person standard of criminality." (Emphasis in original and internal quotation marks omitted.) *Id.* (quoting *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011). This court held that, under *Elonis*, the provisions lacked a mental state requirement and, therefore, violated due process. *Relerford*, 2017 IL 121094, ¶ 15; *Relerford*, 2016 IL App (1st) 132531, ¶ 27.

¶ 33 However, our supreme court found that this court erred in vacating the defendant's convictions based on *Elonis*. *Relerford*, 2017 IL 121094, ¶ 22. It noted that *Elonis* was not a due process case but "merely decided a question of statutory interpretation and determined that, where the subject criminal statute was silent as to *mens rea*, a mental state of intent or knowledge would suffice." *Id.* ¶ 21. The supreme court determined that this court's conclusion that due process does not permit criminal liability based on negligent conduct is unfounded and that substantive due process does not categorically rule out negligence as a permissible mental state for imposition of criminal liability. *Id.* ¶ 22.

¶ 34 2. Defendant's Case and Due Process

¶ 35    We turn to defendant's claim that subsection (a) of the cyberstalking statute violates due process. Defendant asserts that *Relerford* did not make a due process holding and only rejected this court's reasoning that *Elonis* mandated finding that subsection (a) violated due process. He asserts that *Relerford* left open the question regarding "whether subsection (a) violated due process under long-standing precedent holding that a criminal statute with a mental state so weak as to sweep in innocent conduct cannot stand."

¶ 36    Statutes are presumed constitutional, and the party challenging the statute has the burden of proving that it is unconstitutional. *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 39. Under the legislature's police power, it "has wide discretion to fashion penalties for criminal offenses, but this discretion is limited by the constitutional guarantee of substantive due process, which provides that a person may not be deprived of liberty without due process of law." *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011). A statute violates due process if "it potentially subjects wholly innocent conduct to criminal penalty without requiring a culpable mental state beyond mere knowledge." *Id.* at 467. Innocent conduct is conduct "wholly unrelated to the legislature's purpose in enacting the law." *People v. Hollins*, 2012 IL 112754, ¶ 28.

¶ 37    When a statute does not implicate a fundamental right, the test for determining whether the statute complies with substantive due process is the rational basis test. *Id.* ¶ 15. Under this test, a statute will be upheld if "it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable." *Id.* Here, defendant does not assert that this case implicates a fundamental right and acknowledges that the rational basis test is appropriate, as he states "[t]he new provisions are thus not a 'rational way of addressing the problem' of stalking." We review *de novo* a challenge to the constitutionality of a statute because it presents a question

of law. *Relerford*, 2017 IL 121094, ¶ 30. We conclude that subsection (a) of the cyberstalking statute under which defendant was convicted does not violate due process.

¶ 38    In *Relerford*, the supreme court determined that this court's conclusion that due process does not permit criminal liability based on negligent conduct was unfounded and that substantive due process does not categorically rule out negligence as a permissible mental state for the imposition of criminal liability. *Id.* ¶ 22. Thus, the "diluted" or "weak" mental state, as defendant asserts, in subsection (a) is not a basis to invalidate the statute for violating due process.

¶ 39    Further, we disagree with defendant that subsection (a) sweeps in innocent conduct. We must give statutory language "its plain and ordinary meaning," and "words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *Poullette v. Silverstein*, 328 Ill. App. 3d 791, 794-95 (2002). Here, when giving the plain and ordinary meaning to the words in the statute and interpreting the words and phrases as a whole, subsection (a) does not criminalize innocent conduct.

¶ 40    Under subsection (a), as previously discussed, we may imply the mental state of knowledge for the course of conduct element. Thus, a defendant's conduct is considered criminal only if he knowingly engages in two or more nonconsensual acts as defined under the course of conduct definition. See *Relerford*, 2017 IL 121094, ¶¶ 29, 68-69 (under the terms of the amended statute, a defendant must engage in a course of conduct of two or more nonconsensual acts). Further, to be convicted under subsection (a), the State must also prove that the acts were directed at a specific person and that the defendant knew or should have known that the conduct would cause a reasonable person to suffer significant mental suffering, anxiety, or alarm.

¶ 41    In addition, defendant was convicted under the "threat" provision in subsection (a), as the State alleged that he engaged in a course of conduct using electronic communication directed at

Sieler by sending her several threatening text messages saying he was going to kill her. The Merriam-Webster's dictionary defines "threaten" as "to utter threats against." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threaten (last visited June 6, 2019) [https://perma.cc/KEM3-RRC9]. It defines "threat" as "an expression of intention to inflict evil, injury, or damage." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threat (last visited June 6, 2019) [https://perma.cc/FZY2-WE6N].

¶ 42    We cannot find that the statute, which criminalizes knowingly engaging in a course of conduct of two or more threats—expressing an intent to inflict evil, injury, or damage—when he or she knows his conduct would cause a reasonable person to suffers significant mental suffering, involves any innocent conduct. Rather, it can be interpreted to punish only unlawful conduct. See *People v. Bailey*, 167 Ill. 2d 210, 224-25 (1995) (where the stalking statute at issue did not contain the language " 'without lawful authority,' " our supreme court interpreted the statute "as proscribing only conduct performed 'without lawful authority' " and concluded that it did not believe the conduct proscribed in the statute involved any "innocent conduct"); *Douglas*, 2014 IL App (5th) 120155, ¶¶ 44-45 (the court concluded that the statute that provides a defendant who " 'follows, monitors, observes, *** threatens, ***' must do so in a nonconsensual manner" can be interpreted "to punish only unlawful conduct, not consensual, innocent contact").

¶ 43    Moreover, we find that the prohibition against two or more threats directed at a specific person using electronic communications in subsection (a) is rationally related to the legislature's intent in enacting the amended cyberstalking and stalking statutes.

¶ 44    As previously discussed, the legislative history shows that the legislature enacted the cyberstalking statute to include electronic communications as a means through which a

defendant could commit stalking. 92d Ill. Gen. Assem., House Proceedings, May 8, 2001, at 7 (statements of Representative Schoenberg). Before the Senate voted on amending the stalking and cyberstalking statutes in 2010, Senator Hutchinson stated that the amendment updated the cyberstalking law "[s]o it encompasses all technologies that stalkers use to track and harass their victims." 96th Ill. Gen. Assem., Senate Proceedings, May 21, 2009, at 125 (statements of Senator Hutchinson).

¶ 45    When discussing the amendments to the stalking, aggravated stalking, and cyberstalking statutes, Senator Hutchinson stated: "A recent U.S. Department of Justice study said that seventy-six percent of female homicide victims were stalked first, prior to their death. It's terrifying and it's something that we need to do all we can to protect our victims from." 96th Ill. Gen. Assem., Senate Proceedings, May 21, 2009, at 125 (statements of Senator Hutchinson); see *Douglas*, 2014 IL App (5th) 120155, ¶ 46. After citing this testimony, the Fifth District in *Douglas* concluded that the legislature's goal in enacting the legislation "was not to criminalize any innocent contact, but to protect victims of domestic abuse." *Douglas*, 2014 IL App (5th) 120155, ¶ 46. Further, the Third District noted that the legislature's intent in enacting the stalking statute "was to prevent violent attacks by prohibiting conduct that may precede them" and "to avert the terror, intimidation, and justifiable apprehension caused by the harassing conduct itself." *People v. Holt*, 271 Ill. App. 3d 1016, 1021 (1995). And, this court has stated that our supreme court has noted that the legislature's intent in enacting the stalking statute, was " 'to prevent violent attacks by allowing the police to act before the victim was actually injured and to prevent the terror produced by harassing actions.' " *People v. Sucic*, 401 Ill. App. 3d 492, 502 (2010) (quoting *Bailey*, 167 Ill. 2d at 224).

¶ 46   From our review of the legislative history, we conclude that subsection (a) is rationally related to the legislature's goal of protecting victims from violent attacks that occur after the prohibited acts, as here where defendant sent Sieler several threatening text messages, stating he was going to kill her, and subsequently jumped out of the kitchen with a knife in his hand when she arrived home that night.

¶ 47   Accordingly, based on the foregoing, we conclude that subsection (a) does not criminalize innocent conduct or violate due process.

¶ 48                              C. First Amendment

Defendant contends that subsection (a) of the cyberstalking statute violates the first amendment because it is an overbroad prohibition on speech.

¶ 49                        1. *Relerford* and the First Amendment

¶ 50   In *Relerford*, the supreme court found that the provisions in subsection (a) of the stalking and cyberstalking statutes that made it "criminal to negligently 'communicate[ ] to or about' a person, where the speaker knows or should know the communication would cause a reasonable person to suffer emotional distress" violated the first amendment because they were overbroad. *Relerford*, 2017 IL 121094, ¶ 63.

¶ 51   In reaching this conclusion, the court found that the true threats exception did not apply, noting that the State offered "no cogent argument as to how *a communication to or about a person* that negligently would cause a reasonable person to suffer emotional distress fits into the established jurisprudence on true threats" and did not "explain how *such a communication, without more*, constitutes a 'serious expression of an intent to commit an act of unlawful violence.' " (Emphases added.) *Id.* ¶ 38. The supreme court also noted that it was "unclear whether the true threat exemption *** would apply to a statement made with innocent intent but

which negligently conveys a message that a reasonable person would perceive to be threatening." *Id.* The court cited conflicting precedent regarding the standard to apply to the true threat exception: whether speech is unprotected only if the speaker subjectively intended the speech as a threat or whether an objective standard applies in which the speaker did not intend to convey a threat but the statements may be understood to do so. *Id.*

¶ 52 The court however did not determine which standard applied because it concluded that subsection (a) specifically included the "making of threats as an independent basis of a course of conduct" and "[t]he prohibition against *distressing communications to or about a person* stands separate and apart from the *proscription against threats*." (Emphases added.) *Id.* ¶ 39. It noted that, "[i]f distressing communications to or about a person are construed to refer to 'true threats,' ***, then the language proscribing threats would be superfluous" and "[s]uch a construction must be rejected because this court presumes that each part of a statute has meaning." *Id. Relerford* also concluded that the "communicates to or about" provision did not fall within the "speech *** integral to criminal conduct" category of unprotected speech. *Id.* ¶¶ 41-48.

¶ 53 The supreme court then concluded that the "communicates to or about" provisions were unconstitutional because they were overbroad in violation of the first amendment. *Id.* ¶ 63. The court found that the provisions in subsection (a) were severable and struck the phrase "communicates to or about" from subsection (a) in each statute. *Id.* ¶ 65. Because the phrase was severable, the court addressed whether the defendant's convictions could be sustained based on other conduct prohibited by the stalking and cyberstalking statutes, including the threat provision. *Id.*

¶ 54                    2. Defendant's Case and the First Amendment

¶ 55    As previously noted, the supreme court issued *Relerford* before defendant filed his opening brief. In defendant's initial brief, he argues that the "communicates to or about" provision was overbroad. In defendant's supplemental brief, he argues that the threat provision in subsection (a) is unconstitutional for the same reasons that the supreme court found the "communicates to or about" provision was unconstitutional. He asserts that *Relerford* "changed the landscape of the law" regarding the constitutionality of certain provisions in the cyberstalking statute and that he was raising the same challenges as he raised in his initial brief but "recharacterizes his arguments to account for the change in the law."

¶ 56    The first amendment, which is binding on the states through the due process clause in the fourteenth amendment, provides that Congress shall not make laws "abridging the freedom of speech." U.S. Const., amends. I, XIV; *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 406 (2006). Generally, "the first amendment prevents the government from proscribing speech or expressive conduct because of disapproval of the ideas expressed." *Pooh Bah Enterprises, Inc.*, 224 Ill. 2d at 407.

¶ 57    Further, content-based laws targeting speech based on its communicative content are presumed invalid. *Relerford*, 2017 IL 121094, ¶ 32. However, the supreme court has recognized certain categories of expression, including "true threats" and "speech integral to criminal conduct," that do not fall within the protections of the first amendment. *Id.* ¶ 33. The United States Supreme Court has defined true threats as threats that "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Under the true threat exception, the "speaker need not actually intend to carry out the threat." *Id.* at 359-60. Instead, the prohibition on true threats protects individuals from "fear of

violence," "the disruption that fear engenders," and "the possibility that the threatened violence will occur." (Internal quotation marks omitted.) *Id.* at 360. Further, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.*

¶ 58    Under the overbreadth doctrine, a statute is considered overbroad "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Alexander*, 2015 IL App (1st) 122858-B, ¶ 30. Under the overbreadth doctrine, a party may challenge a statute as facially unconstitutional, "even if that party's conduct would not fall within the amendment's protection." *Relerford*, 2017 IL 121094, ¶ 50. The purpose for allowing a challenge under the overbreadth doctrine is to avoid "the potential chilling effect that overbroad statutes have on the exercise of protected speech." *Id.* However, the overbreadth doctrine is to be used sparingly. *Sucic*, 401 Ill. App. 3d at 500. "In addressing a facial overbreadth challenge, the first task is to determine whether the statute reaches constitutionally protected speech ***." *Id.*

¶ 59    Although the supreme court in *Relerford* found that the "communicates to or about" phrase in subsection (a) did not fall within the true threat exception and concluded that it was overbroad in violation of the first amendment, it nevertheless determined that the "threats" provision was separate from the "communicates to or about" provision and implied that it could form the requisite course of conduct prohibited by subsection (a). In its analysis regarding whether the "communicates to or about" provision fit within the true threat exception, the court stated that "[t]he prohibition against distressing communications to or about a person stands separate and apart from the proscription against threats" and, "even assuming that statements

which negligently convey a threat are not protected, a course of conduct based on such statements could be prosecuted under the threat portion of subsection (a)." *Relerford*, 2017 IL 121094, ¶ 39. It then stated that, "[i]f distressing communications to or about a person are construed to refer to 'true threats,' *** then the language proscribing threats would be superfluous." *Id.*

¶ 60 Then, after the court concluded that the "communicates to or about" phrase was invalid because it was overbroad, it expressly addressed whether the defendant's conduct could be sustained on other conduct prohibited by the statute, including the threat provision. *Id.* ¶¶ 66, 69 (finding the evidence did not show that the defendant's conduct was threatening, stating, "there is no evidence that any of the calls or e-mails were threatening, they cannot be considered as part of a course of conduct under subsection (a)," "[n]one of those posts included any language that can be construed as a threat specifically directed at her, and counts III and IV alleged only that defendant had threatened [the victim's] coworkers, workplace, and employer," and "[a]s a whole, the Facebook posts are vulgar and intrusive, but they cannot be characterized as conveying a threat against [the victim]"). Accordingly, following *Relerford*, we will address whether defendant's cyberstalking conviction can be sustained based on the threat provision. See *id.* ¶ 39; *People v. Khan*, 2018 IL App (2d) 160724, ¶ 37 (discussing that *Relerford* concluded that subsection (a)(2) "separately cover[ed] the making of true threats, which are not protected").

¶ 61 We conclude that defendant's conviction can be sustained under the threat portion of subsection (a). Here, defendant was charged with cyberstalking in that he engaged in a course of conduct using electronic communication directed at Sieler by sending her several threatening text messages, saying he was going to kill her, and that he knew or should have known that this course of conduct would cause a reasonable person to suffer emotional distress.

¶ 62    The evidence shows that defendant sent Sieler text messages stating "U GONE DIE"; "I WILL F*** MURDER U"; "Dont give a f*** who u tell"; "GET READY TO MEET YOUR MAKER. . . I know how much u love that song (take me to the king) lets make it a reality"; "Join YOU MFN MOMMA N YOU COUSIN B***"; and "Its not a matter of 'if' i catch u but 'when' and when i do, uts gone be ugly and im already prepared to go *** jail for doing it." Officer Murray testified that Sieler, who was crying and upset, stopped him when he was on patrol and told him she was scared to go home because defendant had sent her threatening text messages. She asked Murray to escort her home, and Murray heard defendant say to Sieler two times on the telephone, "I will kill you." Accordingly, unlike the Facebook posts in *Relerford* that did not contain any language that could be construed as threatening, the evidence here shows that defendant's numerous text messages included threatening language specifically directed at Sieler and were "serious expression[s] of an intent to commit an act of unlawful violence" on her. See *Black*, 538 U.S. at 359-60. Thus, unlike *Relerford*, this evidence shows that defendant's statements were threatening and can be characterized as conveying a true threat against Sieler, and therefore defendant's conduct is not protected by the first amendment, and his conviction can be sustained based on the threat provision. See *Relerford*, 2017 IL 121094, ¶¶ 65-66, 69.

¶ 63    Defendant asserts that subsection (a) is unconstitutional because it lacks any elements of a true threat, including that it does not require that "predicate communications express any intent to act in the future." However, as previously discussed, under the true threat exception, the "speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359-60.

¶ 64    Defendant also asserts that subsection (a) is unconstitutional because it does not even refer to an " 'unlawful act of violence.' " We note that, following oral argument, a division in this district issued *People v. Morocho*, 2019 IL App (1st) 153232, and we granted defendant's

motion to cite this authority. In *Morocho*, the court concluded that subsection (a)(2) of the stalking statute, which contains similar provisions to the cyberstalking statute at issue here, did not fit within the true threat exception. In reaching its conclusion, the court noted that subsection (a)(2) "clearly lacks any requirement that a person threaten 'an act of unlawful violence' " and it "fails to limit the threatened action to that of violence." *Id.* ¶ 36 (citing *Black*, 538 U.S. at 359). *Morocho* then concluded that the threat provision was an overbroad prohibition on free speech, noting that it "reaches a vast number of circumstances that limit speech far beyond the generally understood meaning of stalking." *Id.* ¶ 41.

¶ 65    While we acknowledge the court's decision in *Morocho*, defendant has not directed this court to any binding authority to support that, if the statute does not expressly contain the requirements of a true threat as elements of the offense, including an "unlawful act of violence," then the statute under which a defendant is convicted does not fall within the true threat exception or violates the first amendment. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) ("the opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels").

¶ 66    Further, defendant claims that, in *Relerford*, the supreme court "was able to sidestep the question of what kind of mental state the First Amendment requires of a statute that prohibits threats," the "true threat exception requires a mental state of intentionality, or at least knowledge, that the recipient will understand the communication as a threat," and the "true threat" exception requires a subjective intent to threaten.

¶ 67    As previously discussed, we may imply knowledge as the *mens rea* for the course of conduct element. Thus, under subsection (a), a defendant must knowingly engage in a course of conduct, *i.e.*, engage in two or more threats, directed at a specific person, and he must know or

should know that his conduct would cause a reasonable person to suffer other emotional distress. A person acts with knowledge "if he is consciously aware that his conduct is practically certain to cause the prohibited result." *People v. Goodwin*, 2018 IL App (1st) 152045, ¶ 42; 720 ILCS 5/4-5 (West 2014). Thus, because the State must prove that defendant knowingly used electronic communications to communicate two or more threats directed at a specific person, we cannot find that subsection (a) violates the first amendment because it does not require a defendant to have a mental state of intentionality that the recipient will understand the communication as a threat. See *Goodwin*, 2018 IL App (1st) 152045, ¶ 42 (stating that a statute that requires a person knowingly convey a communication containing a threat "makes clear" that the defendant's "subjective intent is relevant to determine whether the State satisfied the requisite elements").

¶ 68    To support defendant's argument that the "true threat exception requires a mental state of intentionality, or at least knowledge, that the recipient will understand the communication as a threat," he cites *People v. Dye*, 2015 IL App (4th) 130799, *People v. Wood*, 2017 IL App (1st) 143135, and *Goodwin*, 2018 IL App (1st) 152045.

¶ 69    In *Dye*, the defendant challenged on appeal whether the State proved beyond a reasonable doubt that his threat to a public official was a true threat within the meaning of *Black*. *Dye*, 2015 IL App (4th) 130799, ¶ 1. Citing *Black*, 538 U.S. at 359-60, the court stated that a "true threat" requires intentionality. *Dye*, 2015 IL App (4th) 130799, ¶ 10. It therefore concluded that the statute under which defendant was convicted, which required knowledge, must be interpreted as requiring intentionality, as it must be interpreted "within the confines of the first amendment." (Internal quotation marks omitted.) *Id.* The court concluded that the State did not prove beyond a reasonable doubt that the defendant's threat was a true threat under *Black*. *Id.* ¶ 12.

¶ 70    In *Wood*, the defendant challenged on appeal the sufficiency of evidence with respect to his conviction for threatening a public official, which required that the defendant knowingly and willfully communicated the threat, and with respect to whether the State proved his communication constituted a true threat. *Wood*, 2017 IL App (1st) 143135, ¶¶ 11-12. Citing *Dye*, 2015 IL App (4th) 130799, ¶ 10, this court stated that, "[i]n interpreting the statute for the offense of threatening a public official, we have held that intentionality on the defendant's part is required." *Wood*, 2017 IL App (1st) 143135, ¶ 13. The court concluded that the defendant's statements were not true threats under *Black*. *Id.* ¶ 14.

¶ 71    Similarly, in *Goodwin*, this court interpreted the same statute at issue in *Wood* and *Dye*, stating that " 'we have held that intentionality on the defendant's part is required.' " *Goodwin*, 2018 IL App (1st) 152045, ¶ 38 (quoting *Wood*, 2017 IL App (1st) 143135, ¶ 13). This court then addressed the sufficiency of evidence regarding whether the State proved beyond a reasonable doubt that the defendant intended his communication to the victim to be a threat that a reasonable listener would understand to be threatening. *Id.* ¶ 42.

¶ 72    In addressing the sufficiency of the evidence, the courts in *Dye*, *Wood*, and *Goodwin* interpreted the statute under which the defendants were convicted (720 ILCS 5/12-9 (West 2014)) to require intentionality to qualify as a true threat under *Black*. *Goodwin*, 2018 IL App (1st) 152045, ¶ 38; *Wood*, 2017 IL App (1st) 143135, ¶ 13; *Dye*, 2015 IL App (4th) 130799, ¶ 10. However, the courts did not find that the statute violated the first amendment because it did not have intent as the required *mens rea*. These cases also did not make the finding that the statute at issue was unconstitutional because it did not expressly provide that the threat element requires subjective intent to be considered a true threat. We are therefore unpersuaded by defendant's reliance on *Dye*, *Wood*, and *Goodwin* to support that subsection (a) violates the first

amendment because it does not contain a mental state of "intentionality, or at least knowledge, that the recipient will understand the communication as a threat" or because it does not provide that a defendant must have a subjective intent to threaten.

¶ 73    We recognize the conflicting precedent regarding whether an objective or subjective intent standard applies when determining whether a defendant's statement is a "true threat." See *Relerford*, 2017 IL 121094, ¶ 38; *United States v. Parr*, 545 F.3d 491, 499-500 (7th Cir. 2008) (discussing the conflicting precedent in the federal circuits regarding whether the objective or subjective standard applied, stating that the objective "reasonable person" test asks "whether a reasonable speaker would understand that his statement would be interpreted as a threat" or "whether a reasonable listener would interpret the statement as a threat," and, under the subjective test, a statement qualifies as a true threat only if the speaker subjectively intended it as a threat); *Goodwin*, 2018 IL App (1st) 152045, ¶ 42 (concluding it would determine whether the State proved that the defendant "intended his communication to [the victim] to be a threat that a reasonable listener would understand to be threatening"); *People v. Bona*, 2018 IL App (2d) 160581, ¶ 26 (discussing the conflicting precedent in the federal courts regarding whether a true threat required " 'proof that the speaker subjectively intended the speech as a threat' " or whether the "reasonable person" standard was sufficient); *People v. Diomedes*, 2014 IL App (2d) 121080, ¶ 35.

¶ 74    We need not determine which standard the State must prove for defendant's statements to be considered true threats not protected because we find that defendant's statements to Sieler were true threats under both the objective and subjective standards.

¶ 75    As previously discussed, the evidence showed that defendant sent Sieler several text messages telling her she was "GONE DIE," "I WILL F*** MURDER U," and "Its not a matter

of 'if' i catch u but 'when' and when i do, uts gone be ugly and im already prepared to go *** jail for doing it." Officer Murray testified that Sieler, who was crying and upset, got his attention and told him she needed help and was scared to go home because her ex-boyfriend had sent her threatening text messages, thus supporting that Sieler believed defendant's statements were threats. Murray heard defendant tell Sieler over the telephone that "I will kill you." Before Sieler entered her home, she fumbled her keys and was shaking. When Sieler walked inside, defendant jumped out from the kitchen with a knife in his hands, growled, and stood in a wrestler's stance, providing support that defendant intended his statements to be threats and he would act in furtherance of them. Defendant told Officer Rankin at the police station that he "would take care of her" and the "police cannot stop things from happening," and he told Sergeant Arvin that he did not know the police were in the apartment but thought "it was [Sieler] and her boyfriend," which provides further support that he intended his statements as threats.

¶ 76    Based on this evidence, we find that, under either the subjective or objective standard, defendant's statements are true threats and the evidence supports that he meant to communicate a "serious expression of an intent to commit an act of unlawful violence" at Sieler. See *Black*, 538 U.S. at 359.

¶ 77    Accordingly, based on the foregoing, we are unpersuaded by defendant's arguments that the "threat" provision does not fit within the true threat exception not protected by the first amendment, and defendant's conduct can be considered true threats not protected. See *Relerford*, 2017 IL 121094, ¶¶ 65-66, 69 (analyzing whether the defendant's conduct could be sustained based on "other conduct prohibited" by the statute, including whether his conduct could be "construed as a threat specifically directed at" the victim). Subsection (a) therefore does not violate the first amendment.

¶ 78                                     III. CONCLUSION

¶ 79     In sum, subsection (a) of the cyberstalking statute does not violate the first amendment or

due process.

¶ 80     For the reasons explained above, we affirm defendant's conviction.

¶ 81     Affirmed.

**No. 1-16-0184**

| | |
|---|---|
| **Cite as:** | *People v. Crawford*, 2019 IL App (1st) 160184 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-6760; the Hon. Frank Zelezinski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, State Appellate Defender, of Chicago (Patricia Mysza, Deputy Defender, and Michael Gomez, Assistant Appellate Defender, of counsel), for defendant-appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People. |